UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

RNC CONSOLIDATED CASES,

**DECLARATION OF RAJU SUNDARAN**

(RJS)(JCF)

------------------------------------------------------------------------ x

RAJU SUNDARAN, an attorney duly admitted to practice in the United States District Court for the Southern District of New York, declares under penalty of perjury and pursuant to 28 U.S.C. §1746 that the following is true and correct:

1. I am an Assistant Corporation Counsel in the office of MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, attorney for defendants.

2. I am familiar with the facts and circumstances stated herein based upon personal knowledge, the books and records of the City of New York, and conversations with its agents and employees. I submit this declaration in support of defendants' reply memorandum of law in further support of their objections to the order of Magistrate Judge James C. Francis IV's, dated January 23, 2008, granting plaintiffs' motions to amend in part.

3. Annexed hereto as Exhibit G is the Order of Magistrate Judge James C. Francis IV, entered March 19, 2008, in all RNC actions concerning the RNC case management orders.

4. Annexed hereto as Exhibit H is the Order of Magistrate Judge James C. Francis IV, entered July 5, 2007, in all RNC actions concerning deposition scheduling.

5. Annexed hereto as Exhibit I is the Order of Magistrate Judge James C. Francis IV, entered October 26, 2007 in all RNC actions suspending deadlines for submission of dispositive motions in each case management order.

6. Annexed hereto as Exhibit J is Order of the Honorable Kenneth M. Karas, entered on July 21, 2005 in MacNamara, *et al.* v. City of New York, *et al.*, 04 CV 9216 (RJS)(JCF).

7. Annexed hereto as Exhibit K is the Case Management Order, entered May 5, 2006, in Tikkun v. City of New York, *et al.*, 05 CV 9901 (RJS)(JCF) specifically setting forth the deadline to amend the complaint.

8. Annexed hereto as Exhibit L is the Case Management Order, entered May 15, 2006, in Portera, *et al.* v. City of New York, *et al.*, 05 CV 9985 (RJS)(JCF) specifically setting forth the deadline to amend the complaint.

9. Annexed hereto as Exhibit M is the Case Management Order, entered November 9, 2005, in Lee v. City of New York, *et al.*, 05 CV 5528 (RJS)(JCF) and Cohen v. City of New York, *et* al., 05 CV 6780 (RJS)(JCF) specifically setting forth the deadline to amend the complaint.

10. Annexed hereto as Exhibit N is the Case Management Order, entered November 10, 2005, in Bell v. City of New York, *et al.*, 05 CV 3705 (RJS)(JCF) and Starin v. City of New York, *et* al., 05 CV 5152 (RJS)(JCF) specifically setting forth the deadline to amend the complaint.

11. Annexed hereto as Exhibit O is the Order of Magistrate Judge James C. Francis IV, entered November 20, 2006, in Phillips, *et al.* v. City of New York, *et al.*, 05 CV 7624 (RJS)(JCF); Coburn, *et al.* v. City of New York, *et al.*, 05 CV 7623 (RJS)(JCF); Sloan, *et al.* v. City of New York, *et al.*, 05 CV 7668 (RJS)(JCF); Galitzer v. City of New York, *et al.*, 05 CV 7669 (RJS)(JCF); Bastidas, *et al.* v. City of New York, *et al.*, 05 CV 7670 (RJS)(JCF); Carney, *et al.* v. City of New York, *et al.*, 05 CV 7672 (RJS)(JCF); and Sikelianos v. City of New York, *et al.*, 05 CV 7673 (RJS)(JCF) and the Order of Magistrate Judge James C. Francis IV, entered

March 2, 2007, in Drescher v. City of New York, *et al.*, 05 CV 7541 (RJS)(JCF), concerning discovery deadlines in the case management orders.

12. Annexed hereto as Exhibit P are excerpts from the Deposition Testimony of Chief Terence Monahan in the RNC cases specifically identifying Commissioner David Cohen in connection with the RNC.

13. Annexed hereto as Exhibit Q are excerpts from the Deposition Testimony of Chief Joseph Esposito in the RNC cases specifically identifying Commissioner David Cohen in connection with the RNC.

14. Annexed hereto as Exhibit R is the Letter from James Mirro, Esq., dated February 1, 2008, to the Honorable Richard J. Sullivan, U.S.D.J., concerning the proposed briefing schedule for defendants' Rule 72 Appeal of Magistrate James C. Francis IV's January 23, 2008 Order granting plaintiffs' motion to amend in part.

15. Annexed hereto as Exhibit S is an Email from Clare Norins, Esq., dated February 3, 2008, to defendants' request for consent to the proposed Rule 72 briefing schedule.

16. I certify that the documents attached as Exhibits G through S to this declaration are true and correct copies of the original documents.

Dated: New York, New York
April 7, 2008

RAJU SUNDARAN (RS 8011)
Assistant Corporation Counsel

Appendix of Cases On Appeal Of January 23, 2008 Order

1. MacNamara, *et al.* v. City of New York, *et al.*, 04 CV 9216 (RJS)(JCF).
2. Rechtschaffer v. City of New York, *et al.*, 05 CV 9930 (RJS)(JCF).
3. Portera v. City of New York, *et al.*, 05 CV 9985 (RJS)(JCF).
4. Bunim, *et al.* v. City of New York, *et al.*, 05 CV 1562 (RJS)(JCF).
5. Kalra, *et al.* v. City of New York, *et al.*, 05 CV 1563 (RJS)(JCF).
6. Ryan, *et al.* v. City of New York, *et al.*, 05 CV 1564 (RJS)(JCF).
7. Garbini, *et al.* v. City of New York, *et al.*, 05 CV 1565 (RJS)(JCF).
8. Greenwald, *et al.* v. City of New York, *et al.*, 05 CV 1566 (RJS)(JCF).
9. Pickett, *et al.* v. City of New York, *et al.*, 05 CV 1567 (RJS)(JCF).
10. Tremayne, *et al.* v. City of New York, *et al.*, 05 CV 1568 (RJS)(JCF).
11. Biddle, *et al.* v. City of New York, *et al.*, 05 CV 1570 (RJS)(JCF).
12. Moran, *et al.* v. City of New York, *et al.*, 05 CV 1571 (RJS)(JCF).
13. Botbol, *et al.* v. City of New York, *et al.*, 05 CV 1572 (RJS)(JCF).
14. Crotty, *et al.* v. City of New York, *et al.*, 05 CV 7577 (RJS)(JCF).
15. Stark, *et al.* v. City of New York, *et al.*, 05 CV 7579 (RJS)(JCF).
16. Lalier, *et al.* v. City of New York, *et al.*, 05 CV 7580 (RJS)(JCF).
17. Grosso v. City of New York, *et al.*, 05 CV 5080 (RJS)(JCF).
18. Dudek v. City of New York, *et al.*, 04 CV 10178 (RJS)(JCF).
19. Bell v. City of New York, *et al.*, 05 CV 3705 (RJS)(JCF).
20. Starin v. City of New York, *et al.*, 05 CV 5152 (RJS)(JCF).
21. Lee v. City of New York, *et al.*, 05 CV 5528 (RJS)(JCF).
22. Cohen v. City of New York, *et al.*, 05 CV 6780 (RJS)(JCF).

23. Phillips, *et al.* v. City of New York, *et al.*, 05 CV 7624 (RJS)(JCF).

24. Coburn, *et al.* v. City of New York, *et al.*, 05 CV 7623 (RJS)(JCF).

25. Drescher v. City of New York, *et al.*, 05 CV 7541 (RJS)(JCF).

26. Bastidas, *et al.* v. City of New York, *et al.*, 05 CV 7670 (RJS)(JCF).

27. Xu, *et al.* v. City of New York, *et al.*, 05 CV 7672 (RJS)(JCF).

28. Sloan, *et al.* v. City of New York, *et al.*, 05 CV 7668 (RJS)(JCF).

29. Galitzer v. City of New York, *et al.*, 05 CV 7669 (RJS)(JCF).

30. Sikelianos v. City of New York, *et al.*, 05 CV 7673 (RJS)(JCF).

31. Abdell, *et al.* v. City of New York, *et al.*, 05 CV 8453 (RJS)(JCF).

32. Adams, *et al.* v. City of New York, *et al.*, 05 CV 9484 (RJS)(JCF).

33. Araneda, *et al.* v. City of New York, *et al.*, 05 CV 9738 (RJS)(JCF).

34. Eastwood, *et al.* v. City of New York, *et al.*, 05 CV 9483 (RJS)(JCF).

35. Tikkun v. City of New York, *et al.*, 05 CV 9901 (RJS)(JCF).

# EXHIBIT G

THIS ORDER IS TO BE DOCKETED & FILED IN ALL RNC CASES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

(ECF)

MICHAEL SCHILLER, et al.,

Plaintiffs,

- against -

THE CITY OF NEW YORK, et al.,

Defendants.

04 Civ. 7922 (RJS) (JCF)
***LEAD CASE***

HACER DINLER, et al.,

Plaintiffs,

- against -

THE CITY OF NEW YORK, et al.,

Defendants.

04 Civ. 7921 (RJS) (JCF)

O R D E R

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 3/19/08

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Defendants having requested by letter dated February 13, 2008 an order requiring plaintiffs in all RNC cases to identify those non-party witnesses they expect to call at trial, it is hereby ORDERED as follows:

1. By March 31, 2008, counsel for all parties shall identify all non-party fact witnesses that they reasonably expect to testify at trial on behalf of their respective clients.

2. Absent exceptional circumstances, depositions of fact witnesses are concluded in all RNC cases, consistent with the case management orders. While some of the case management orders were extended de facto by the master deposition scheduling order, there was no basis for assuming that they had been abandoned altogether.

This Order does not preclude depositions necessitated by Judge

Sullivan's determination of issues now pending before him.


SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          March 19, 2008


Copies mailed this date:

All Plaintiff's Counsel

Gerald S. Smith, Esq.
Senior Corporation Counsel
City of New York Law Department
100 Church Street
New York, NY 10007

# EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

(ECF)

MICHAEL SCHILLER, FRANCESCA FIORENTINI, ROBERT CURLEY, and NEAL CURLEY,

Plaintiffs,

- against -

The CITY OF NEW YORK; RAYMOND KELLY, Commissioner of the New York City Police Department; TERENCE MONAHAN, Assistant Chief of the Bronx Bureau of the New York City Police Department,

Defendants.

04 Civ. 7922 (KMK) (JCF)

LEAD CASE

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/5/07

DOCKET IN ALL RNC CASES

HACER DINLER, ANN MAURER, ASHLEY WATERS,

Plaintiffs,

- against -

CITY OF NEW YORK, COMMISSIONER RAYMOND KELLY,

Defendants.

04 Civ. 7921 (KMK) (JCF)

O R D E R

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Counsel having submitted lists of agreed dates for depositions as well as lists of deponents for whom no date has been agreed upon, it is hereby ORDERED as follows:

1. Depositions shall be conducted in accordance with the schedule set forth in the Appendix to this order. Counsel may deviate from that schedule only upon written stipulation or further order of the Court.

2. Where counsel appear to have agreed on more than one date for any witness, that witness has been listed for multiple dates.

3. Witnesses previously deposed have not been included in the schedule. If and when a dispute arises concerning either the propriety of recalling such a witness or the date of such a deposition, I will adjudicate those issues.

4. All counsel shall receive electronic notice of this order via ECF.

SO ORDERED.

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
July 5, 2007

Copies mailed this date:

Christopher T. Dunn, Esq.
New York Civil Liberties Union
125 Broad Street, 17th Floor
New York, New York 10004

Peter G. Farrell, Esq.
Special Assistant Corporation Counsel
City of New York Law Department
100 Church Street
New York, New York 10007

Joseph Carranza
P.O. Box 575060
Whitestone, New York 11357

# APPENDIX

July 2-6, 2007

| Date | Plaintiffs Witnesses | Defendants Witnesses |
|---|---|---|
| 7/2 | Crotty | |
| 7/3 | Geocos<br>Hardesty | PO Denise Rose Hinksman<br>Sgt. Sean O'Connor |
| 7/5 | | DC Vincent Giordano |
| 7/6 | Flynn | |
| | July 9-13, 2007 | |
| 7/9 | Ryan | Captain William Crossan<br>PO Linder |
| 7/10 | Lucrezia<br>Neary<br>Roebling<br>Tepsic | PO Keri Mitchell<br>Sgt. Evan Minoque<br>Lt. David Sleve<br>Insp. James McCarthy |
| 7/11 | Henriksan<br>Heinegg<br>Migliore<br>Burns | |
| 7/12 | Rochfort<br>Charity James | PO Donald Nelzi<br>Sgt. Michael Sold<br>PO Jeremiah Malone |
| 7/13 | Rosemoore<br>Vaughan<br>Poe<br>Hannah Janeway | Captain Ronald Mercandetti |
| | July 16-20, 2007 | |
| 7/16 | Ponce<br>Lorusso<br>Stone | Sgt. Allison Mullen<br>Lt. Byrne<br>PO Michael Eils<br>PO Michael Caligere<br>Lt. Brian Jackson<br>Lt. Chris Delsante |
| 7/17 | Vaull<br>Milne<br>Marx | Sgt. Eddie Murpy<br>Det. Michael Cummings<br>PO Phillip Facenda<br>PO Magdalen Kobiolka<br>PO Yahaira LaChapell |

| | | |
|---|---|---|
| 7/18 | Lalier<br>Marty<br>Rosenberg<br>Paris | Lt. James O'Sullivan<br>Sgt. Jorge Encarnacion<br>PO Cuong Nguyen |
| 7/19 | Paine<br>C. Lee<br>Ortiz<br>Palmer | UC 6216<br>PO Johanna Greenberg<br>PO Timothy Cai<br>PO Ed Harrigan |
| 7/20 | Parrot<br>Melchor<br>Church<br>Howe | Lt. John Berquist<br>PO Valerio Rodriguez<br>PO Joseph Cappleman |

July 23-27, 2007

| | | |
|---|---|---|
| 7/23 | Biddle<br>Benjamin<br>Goldenberg<br>Jashnani | Cpt. Chico<br>Cpt. Alexander Laera<br>EMT Emery Taylor |
| 7/24 | Biddle<br>Ingber<br>Wipfli<br>Henry | PO Vincent Fortunato<br>PO Victor Perez<br>Sgt. Allison Keating<br>PO Tyree Fischer<br>PO Sal Sedita |
| 7/25 | Wood<br>Hasa<br>Feinstein<br>Miller | Chief William Morris<br>Sgt. Donnelly<br>Sgt. Darligan |
| 7/26 | Bekavac<br>Hardesty<br>Dickerson<br>St. Laurent | Connie Fisher<br>Lt. John Dolan<br>Sgt. Evelyn Rivera<br>Sgt. Conor McCourt<br>PO Brett Bara<br>PO Heriberto Mercado |
| 7/27 | Adams<br>Stark<br>Cheung<br>Petrick | John Doe White Shirt Supervisor |

July 30-Aug.3, 2007

| | | |
|---|---|---|
| 7/30 | Stipe<br>Muellan<br>Pogge<br>Goldberg | Lt. Daniel Albano<br>PO Courtney Hamlin<br>Sergio Coppola |
| 7/31 | Zalk<br>Crook<br>Mukerjee<br>Robinson | DI Michael Yanosik<br>Sgt. William Murphy<br>PO Remy Randall<br>PO Daniel Ryan<br>PO Christopher Chan<br>PO Patrick Speechley |

| | | |
|---|---|---|
| 8/1 | Giuliani<br>Roberts<br>Swink<br>Howard | Steven Hammerman<br>PO Jose Chaparro |
| 8/2 | Mitrano<br>Albert<br>Raymond | Insp. Thomas Pelligrino<br>Captain Eugene Montchal<br>PO Daniel Jasinski<br>Lt. John Pribetich |
| 8/3 | Fowler<br>Bornstein<br>Nechay<br>Shiller | PO Adam Piergostino<br>PO Thomas Carney<br>PO Patrice Barolette |

Aug. 6-10, 2007

| | | |
|---|---|---|
| 8/6 | Sladek<br>Averbakh<br>Jones<br>O'Reilly | PO Michael Balicki<br>Sgt. Bolte<br>PO Jagdeep Singh |
| 8/7 | Griffith<br>Wood<br>Hall<br>Turse | PO John Cousins |
| 8/8 | Taft<br>Alexander<br>Tejada<br>Ellisen | PO Melissa Roman<br>Insp. Ward |
| 8/9 | Lewis<br>Sidle<br>Ogden-Nuss<br>Remmes | PO Gregory Kambach<br>Ranking DCPI employees at 16th St.<br>Ranking NYPD Legal Bureau at 16th St. |
| 8/10 | Bensen<br>Sidle<br>Lefemine | Sgt. Michael Ingram<br>PO Javier Cordero<br>Chief Michael Scagnelli<br>Sgt. Arthur Smarsch<br>PO Kathleen Curnyn |

Aug. 13-17, 2007

| | | |
|---|---|---|
| 8/13 | Nelia<br>Calabrese<br>Cook<br>Bhalla | PO Raymond Ng<br>Ranking DCPI employee Fulton St.<br>PO Matt Wohl<br>PO Walter Padilla<br>PO Martin Vasquez |
| 8/14 | Flaton<br>Luci<br>Bunn<br>Rigby | Lt. James Griffin<br>Lt. Joseph Sitro<br>PO Michael Carrieri<br>PO Joseph Andrade |

| | | |
|---|---|---|
| 8/15 | Gingold<br>Lang<br>Richins | PO Kegham Jarjokian<br>Cmmr. Garry McCarthy<br>Cmmr. Robert Messner<br>"Blue"<br>PO Christopher Triquet |
| 8/16 | Chandra<br>Rivera<br>Spector<br>Rettstadt | Capt. Robert Bonifati<br>Sgt. Crichigno<br>Sgt. Daniel Sarrubbo |
| 8/17 | Botbol<br>Blackburn<br>Kyne | Captain Dowling<br>PO Steven Papola |

Aug. 20-24, 2007

| | | |
|---|---|---|
| 8/20 | Roth<br>Lassel<br>Behling<br>Duncan | Captain Dermot Shea<br>PO Brian McSweeney<br>PO James Wolff<br>PO John Rooney |
| 8/21 | Rechtschaffer<br>Bhagat<br>Rubin<br>Dietzen<br>Cohen | PO Neil Rodriguez<br>Sean Gumbs<br>Patrick Quigley |
| 8/22 | Rorvig<br>Langley<br>Emmer<br>Knapp | PO Victoria Schneider |
| 8/23 | O'Dierno<br>Todd<br>Glick<br>Grisham | PO Noel Rodriguez<br>Insp. John Hughes |
| 8/24 | Pielri<br>Winkler<br>T. Gaster | Sgt. Gregory Pekera<br>PO Jason Wolf<br>PO Tanisha Diaz<br>Martin Paolino<br>Sgt. Leslie Chan |

Aug. 27-31, 2007

| | | |
|---|---|---|
| 8/27 | Aikman<br>Davidson<br>Trinkl<br>Eastwood | PO Michael Filoseta<br>Lt. Chris Pasquarelli |
| 8/28 | Pelcynski<br>Muench<br>Rosenthal<br>Trudell<br>C. Dwyer | Sgt. Jim Giambrone<br>Sgt. Hugh Byrne |

| | | |
|---|---|---|
| 8/29 | Fremont<br>Borok<br>Renwick<br>Hunt<br>Martin | Sgt. Anthony Rivers<br>Sgt. Janus Fitzpatrick<br>PO David Lawrence<br>PO Gregory Markowski |
| 8/30 | Portera<br>Buhle<br>Walker<br>Wu | Lt. Antonio Venice |
| 8/31 | Greenwald<br>Vreeland<br>Conley | PO Anthony Mason |
| | Sept. 3-7, 2007 | |
| 9/4 | Galitzer<br>Brar<br>DeBruhl<br>Gaster | Sgt. Holmes |
| 9/5 | Viertel<br>Janeway<br>Tremayne<br>Stephens<br>Kalra | Lt. Christopher Czark<br>Sgt. John White<br>Sgt. Anthony Dellavalle |
| 9/6 | Katz<br>Kappel<br>Gamboa<br>Sanchez<br>Albertson | PO Francesco Belluscio<br>PO Robert Hamer |
| 9/7 | Biddle<br>Rubinfeld<br>Ferrand-Sapsis<br>Wilson<br>Walden<br>Carranza | Comm. Thomas Doepfner |
| | Sept. 10-14, 2007 | |
| 9/10 | Argyros<br>Quick<br>Reyna<br>Janney<br>Wright | Sgt. Geraldine Falcon<br>Sgt. Frederick Grover<br>PO John Martinez<br>PO Jacqueline DeCarlo |
| 9/11 | Juarez<br>Mathews<br>Williamson<br>Esquiviel | Ruby Marin-Jordan<br>Det. Ahearn<br>Sgt. DeConne |

| | | |
|---|---|---|
| 9/12 | Kojis<br>Holt<br>Gross<br>Ekberg<br>Albertson | Lt. John Connolly |
| 9/13 | Freas<br>Davies<br>A. Sensiba<br>G. Sensiba | Insp. Kerry Sweet |
| 9/14 | Bastidas<br>Shekarchi<br>Mulligan<br>Segal<br>Jordan | PO Kevin Scott<br>Sgt. Anthony Kempinski<br>Sgt. Marc Manara |

Sept. 17-21, 2007

| | | |
|---|---|---|
| 9/17 | Soloff<br>Becker<br>Capps<br>Lovecchio | Insp. John O'Connell<br>PO Joseph Fong<br>PO Brian Martin<br>PO John Murtagh |
| 9/18 | Sakayama<br>Edwards<br>Epstein<br>Drummond<br>Walsh | SA Stephen Hughes |
| 9/19 | Reed<br>Rahn<br>Vik<br>Hotchkiss<br>O'Reilly-Rowe | Captain Thomas Arnet<br>PO Bart Pipcinski<br>Lt. Daniel Hayes<br>Sgt. Steven Dean<br>Mark Vazques |
| 9/20 | Majmudar<br>Schulmeister<br>Consigny<br>Catchpole<br>Drescher | PO Raul Santos<br>PO Michael Christian |
| 9/21 | Weaver<br>Belbin<br>Parry<br>Spritzer | Captain Andrew Savino<br>PO Santo Ippolito<br>PO William Haut |

Sept. 24-28, 2007

| | | |
|---|---|---|
| 9/24 | Barron<br>Cox<br>Pardew<br>D. Dwyer<br>Petrello | Lt. Daniel MacFarland<br>PO Neil Stumpf<br>PO Christopher Krutys |

| | | |
|---|---|---|
| 9/25 | Laura<br>K. Roberts<br>Bunim<br>Zambeck<br>Arenda | PO Michael Safoshnick<br>PO Josh Lewis<br>PO Linda Araque<br>PO Mark Steiner |
| 9/26 | Caspar<br>Dyer<br>Schoemann<br>Wilson<br>Miller | Crim. Justice Coordinator Reps.<br>Sgt. O'Toole<br>Sgt. Marerro |
| 9/27 | Adamson<br>Haglund<br>Podber<br>Ditman<br>Cohnen | Sgt. Gantt<br>White shirted supervisor |
| 9/28 | Jabour<br>Shaw<br>Weikart<br>Noonan<br>Lang | Yahoshua Blisko |

Oct. 1-5, 2007

| | | |
|---|---|---|
| 10/1 | Xu<br>Zariela<br>Handleman<br>Assam<br>Kressly | PO Debra Mitchell<br>PO James Grimes<br>PO Alberto Angilletta<br>PO Rene Sola |
| 10/2 | Kaplan<br>Vendetti<br>Pan<br>Rueckner | Det. Joseph Sobolewski<br>PO Jason Stewart<br>PO Sontz<br>PO Timothy Spies<br>PO Ebony Huntley |
| 10/3 | Heinhold<br>Kunz<br>Ellmannn<br>Martini<br>Miller | PO Mona Phillips<br>Capt. Kavanaugh<br>Carmine Fiore |
| 10/4 | Flanigan<br>Eifert<br>Toerper<br>James<br>Cavanagh | Lt. Connolly<br>Sgt. Chang<br>Det. Nicholas Stanich<br>PO Brendan Meehan |
| 10/5 | Miller<br>Hurley<br>Whitney<br>Norwid<br>Turner | PO Jason Martinoff<br>Sgt. Thomas Durkin<br>PO Gary Florencio |

Oct. 8-12, 2007

| | | |
|---|---|---|
| 10/8 | Potok<br>Gibbons | Sgt. Ronald Meyers<br>Sgt. Gerald Fitzpatrick<br>PO Poletto<br>PO Glenn Hudecek |
| 10/9 | Lesser<br>Dress<br>Taylor<br>Hottle<br>Lahn | PO Elvis Shero<br>Carlos Pucheco<br>Isaura Peralta |
| 10/10 | Reilly<br>Levin<br>Lynn<br>Hernandez<br>Tikkun | Amir Rasheed<br>PO Donna Farrell<br>PO Shawn Allen |
| 10/11 | Porto<br>Rosen<br>Weltha<br>Rose<br>Kanouse | Commander Charles DiRienzo<br>Lt. Charles Harnan<br>PO Gregory Michels<br>PO Louron Hall |
| 10/12 | Phillips<br>Maddox<br>Grimshaw<br>M. Lee<br>Ashbeck | Shakeel Ansari<br>PO James Chung<br>PO Michael Bonacci<br>PO Pavel Gomez |

Oct. 15-19, 2007

| | | |
|---|---|---|
| 10/15 | Harak<br>Coburn<br>Heifetz<br>Bacon<br>Davis | PO Shield 4483<br>Sgt. Young<br>PO Steven Caraballo<br>PO Hui Chi |
| 10/16 | Ross<br>Cody<br>Strasser<br>Barber<br>Larson | PO Manzi<br>PO Adam Panasuk<br>PO Michael Ali |
| 10/17 | Conklin<br>Palmer<br>McGee<br>Gross<br>Kantor | PO Matthew Sherman<br>PO Maria Veliz<br>PO Victor Lebron<br>PO James Connolly |
| 10/18 | Goldstein<br>Peterson<br>Carney<br>Kavanagh | Sgt. Gutierrez<br>Sgt. Reynolds<br>Sgt. Rivers<br>Sgt. Rivera |

| | | |
|---|---|---|
| 10/19 | Espisito<br>Tuzzolo<br>McEldowney<br>Langergaard<br>Kocek | PO Gabriel Healy<br>Gregory Fontaine |

Oct. 22-26, 2007

| | | |
|---|---|---|
| 10/22 | Thomas-Melly<br>Aronowsky<br>Breznau<br>Nawalkowsky<br>Laken | PO Tyrone Riggan<br>PO Franklin Diaz<br>PO Colleen Killen |
| 10/23 | Wilcox<br>Mahoney<br>Murdock<br>Crane<br>Hill | Policy Witness (Tikkun) |
| 10/24 | Weiss<br>Partnow<br>Seshimo<br>Lanctot<br>Hedemann | PO Felicia Alfred<br>PO Sgt. Calderone |
| 10/25 | Swanson<br>Sassone<br>Pickett<br>Duvall<br>Lahond | PO Kimberly Daly<br>PO Michael Gonzalez<br>PO Terence McMenamy |
| 10/26 | Stefanelli<br>Gindi<br>Anastasio<br>Barrows<br>Boisvert | PO Giuseppe Ganci<br>Sgt. Shield 2713<br>PO Lucille Fredericks |

Oct. 29-Nov. 2, 2007

| | | |
|---|---|---|
| 10/29 | Sikelianos<br>Kaye<br>Sperry<br>Wetherby<br>Siegel | PO John Woods<br>PO Michael Deckert |
| 10/30 | Meyer<br>Pelzek<br>Gordon<br>Barfield | PO Moises Martinez<br>PO Thomas McDonnell |
| 10/31 | Sloan<br>Fix<br>Adams<br>Logan<br>Parrott | PO Joseph Bucchignano<br>PO Virgilio Benscosme |

| | | |
|---|---|---|
| 11/1 | Lovejoy<br>Philips<br>Lebet<br>Nicinski<br>McGee | Lt. James Johnson<br>Captain McCormack |
| 11/2 | Hobbs<br><br>Vilanova-Marques<br>Duhaime<br>San Marchi<br>Dorals | Official re DOCS Planning & Arrest Processing<br>David Szaboles<br>Stephen Valentine |
| | Nov. 5-9, 2007 | |
| 11/5 | Flynn<br>Martin<br>White<br>Shotwell<br>Colville | PO Robert Martin<br>PO Gerard Neumann |
| 11/6 | Hankin | Sgt. Acosta<br>Shield 14447<br>Lt. Thomas Lowe |
| 11/7 | Schutzenhofer<br>Moran<br>Freitag<br>Krassan<br>Benn | Roland Betts<br>PO Gregory Bell |
| 11/8 | Adame<br>Elfrank-Dana<br>Reyes<br>Scofield<br>Kern | Insp. James Capaldo<br>Lt. Raymond Spinella<br>PO Michael Ho<br>PO Drew Repetti |
| 11/9 | Landwehr<br>Jenkins<br>Pincus<br>D'Ornellas<br>Murray | PO Khamwate Brijbukhan<br>PO Dominick Bizarro |
| | Nov. 12-16, 2007 | |
| 11/12 | Walsh<br>Perry<br>Hardie<br>Joseph | PO John Epstein<br>N. Hoy |
| 11/13 | Corley<br>Ross<br>Bernard<br>Beeny | Scooter Supervisor |

| | | |
|---|---|---|
| 11/14 | Doxtader<br>Kerns<br>Burns<br>DeMott | PO James Roscher<br>Det. Christopher Ambrose<br>PO Thomas Crean<br>PO David Cicatiello |
| 11/15 | Hill<br>Prokop<br>Kinane | Kenneth Singleton<br>PO Matthew Loftus |
| 11/16 | Charney<br>Agnase<br>Gunn<br>Ivors | Cpt. John Scolaro |

# EXHIBIT I

UNITED STATES DISTRICT COURT (ECF)
SOUTHERN DISTRICT OF NEW YORK

MICHAEL SCHILLER, et al.,

Plaintiffs,

- against -

THE CITY OF NEW YORK, et al.,

Defendants.

04 Civ. 7922 (RJS) (JCF)
***LEAD CASE***

**DOCKET IN ALL RELATED CASES**

HACER DINLER, et al.,

Plaintiffs,

- against -

THE CITY OF NEW YORK, et al.,

Defendants.

04 Civ. 7921 (RJS) (JCF)

O R D E R

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/26/07

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

In view of the outstanding discovery issues in many of the cases consolidated for discovery, the deadlines currently established by each case management order for submission of dispositive motions are suspended pending further order of the Court.

SO ORDERED.

James C. Francis IV
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
October 26, 2007

# EXHIBIT J

JUL 11 2005

MOORE & GOODMAN, LLP
ATTORNEYS AT LAW
740 BROADWAY AT ASTOR PLACE
NEW YORK, N.Y. 10003-9518

TELEPHONE (212) 353-9587
FACSIMILE (212) 674-4614

JONATHAN C. MOORE*
WILLIAM H. GOODMAN**

DAVID MILTON

*ALSO ADMITTED IN CALIFORNIA AND ILLINOIS
**ALSO ADMITTED IN MICHIGAN

JANICE M. BADALUTZ
PARALEGAL/INVESTIGATOR

OF COUNSEL
MICHAEL HADDAD
JULIA SHERWIN

MEMO ENDORSED

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/12/05

July 5, 2005

**VIA FAX: 212-805-7968**
The Honorable Kenneth M. Karas
United States District Court
500 Pearl Street
New York, NY 10007

**Re: MacNamara et al. V, City of New York, et al., 04 CV 9216 (KMK)**

Your Honor,

Our law office has unexpectedly lost our lease and as a consequence, we are requesting a three-month delay in the previously negotiated and ordered Case Management Order (CMO) in the above-captioned case. I have contacted counsel for the defendants and we have agreed upon the following modifications in the CMO and are jointly requesting that the Court enter an Order, in accordance therewith.

We have agreed that, with the Court's permission, all dates set forth in the CMO (beginning with Paragraph 8) shall be postponed three months, with the following conditions and exceptions:

1. Plaintiffs' responses to the City's interrogatories and document requsets, served on May 20, 2005, along with all executed releases, shall be served upon the City on a rolling basis, but no later that July 18, 2005;
2. The depositions of the named plaintiffs, noticed by the defendants on June 15, 2005 are adjourned until the pertinent records are produced and the parties set mutually convenient dates for the depositions, with the understanding that the last of these depositions shall be completed before plaintiffs serve their motion for class certification;
3. All of the provisions of the current CMO remain in place except those deadlines

MOORE & GOODMAN, LLP

**MEMO ENDORSED**

affected by this agreement and Order;

4. Plaintiffs shall file their Amended Complaint by July 15, 2005, and defendants' response shall be due by August 22, 2005;
5. In the event that any witnesses whom the plaintiffs' seek to depose in this case, aside from arresting officers, are first noticed in another RNC case, plaintiffs will participate in that deposition rather than depose the witness separately.

The parties have also agreed that two of the plaintiffs, Julia Cohen and Chris Kornicke, will be dismissed without prejudice, as they have obtained new counsel. We will prepare a stipulation and Order. We thank the Court for its patience and cooperation.

Sincerely,

William Goodman
Moore & Goodman, LLP

cc: James Mirro
Fax: 212-788-9776

With the exceptions noted in this letter, and for the reasons stated therein, the dates set forth in the Case Management Order (Doc # 21) below paragraph 6 are postponed for two months.

SO ORDERED

KENNETH M. KARAS U.S.D.J.
7/15/05

# EXHIBIT K

USDC
DOC
ELEC... ...LLY FILED
DOC #
DATE FILED: 5/5/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KAITLYN TIKKUN, et al.,

Plaintiff,

-versus-

THE CITY OF NEW YORK, et al.

Defendants.

--- x

**CASE MANAGEMENT ORDER**

05 CV 9901 (KMK)(JCF)

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court hereby enters its Case Management Order governing the foregoing case. This case arises from the arrest and detention of plaintiff by the New York City Police Department around the time of the Republican National Convention in New York City in late August and early September 2004 ("RNC Cases"). It involves numerous Defendants including the City of New York, its Mayor and Commissioner of Police.

In this case, the parties expect that issue will be joined shortly and that all of the material allegations of the complaint will be denied. Defendants have stipulated to the following terms at this time to permit Plaintiffs in these actions the opportunity to participate in the consolidated discovery currently underway in the related RNC Cases. In the interests of the convenience and economy of the parties, and the efficient management and oversight of the Court's docket, the Court hereby enters this order, the provisions of which are designed to be compatible with those in the RNC Case of *Macnamara, et al. v. The City of New York, et al., No. 04-CV-9216 (KMK) (JCF)* and others.

In addition to this order, the parties are bound by (and the Court is entering in this case separately) Discovery Order #1 (which provides for the consolidated depositions of certain

defense witnesses) and Protective Order #1 (which provides for the confidential treatment of certain discovery materials).

The Court is advised that the parties do not consent to trial of this case by magistrate judge. The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. All motions and applications shall be governed by the Court's Individual Practices, including pre-motion conference requirements. This order may be modified only by agreement of the parties, subject to the Court's approval, or upon a showing of good cause.

| ***DATE DUE*** | ***PLEADINGS & DISCOVERY*** |
|---|---|
| | The parties have agreed to dispense with initial disclosures and have commenced discovery. |
| 5/1/06 | Plaintiffs shall have served any amended complaint adding claims or joining parties. No further amendment to the complaint shall be permitted without leave of court. |
| 5/31/06 | The parties currently expect that the consolidated depositions of defense witnesses, as contemplated by Discovery Order #1, shall proceed at least through this date. |
| 8/1/06 ~~11/1/06~~ | All written discovery, including document requests and interrogatories, shall have been served, except as provided below. |
| 11/1/06 ~~2/1/07~~ | All depositions of fact witnesses shall have been noticed. With respect to both fact and expert witnesses, unless the noticing party assents, depositions of particular witnesses are not to be held until the party producing the witness has responded to any outstanding interrogatories and requests for documents pertaining to that witness. Once a party has completed the deposition of a witness, that party shall not later seek to re-depose that witness absent good cause. |
| 2/1/07 (handwritten "2" over struck digit) | All fact discovery shall have been completed. |
| 3/1/07 (handwritten "3" over struck digit) | Plaintiffs shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |

| | |
|---|---|
| 4/1/07 | Depositions of plaintiffs' trial experts shall be completed. |
| 5/1/07 | Defendants shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 6/1/07 | Depositions of defendants' trial experts shall be completed. |
| 7/1/07 | All contention interrogatories and requests to admit shall be served. |
| 8/1/07 | All responses due to contention interrogatories and requests to admit. |
| 8/15/07 | All counsel must meet for at least one hour to discuss settlement no later than this date. |

Counsel for the parties have discussed holding a settlement conference before a Magistrate Judge. The parties request a settlement conference before a Magistrate Judge.

Counsel for the parties have discussed the use of the Court's Mediation Program. The parties do not request that the case be referred to the Court's Mediation Program.

Counsel for the parties have discussed the use of a privately retained mediator. The parties do not intend to use a privately retained mediator.

***DISPOSITIVE MOTIONS***

| | |
|---|---|
| 9/1/07 | All dispositive motions shall have been served. Pursuant to the undersigned's Individual Practices, the parties shall request a pre-motion conference in writing at least four weeks prior to this deadline. |
| 10/1/07 ~~1/1/08~~ | Oppositions due to all dispositive motions. |
| 11/1/07 ~~2/1/08~~ | Replies, if any, due to all dispositive motions. |
| Within 30 days of the Court's ruling on dispositive motions | Should any part of the case remain after the Court's ruling on dispositive motions, a Pre-Trial Conference with the Court shall be held. Prior to that conference, the parties shall consult and submit to the Court a Joint Pretrial Order prepared in accordance with the Undersigned's Individual Practices and Rule 26(a)(3) of the Federal Rules of Civil Procedure. If this action is to be tried before a jury, proposed voir dire, jury instructions and a verdict form shall be filed with the Joint Pretrial Order. Counsel are required to meet and confer on the jury instructions and verdict form in an effort to make an agreed upon submission. |

Case 1:05-cv-09901-RJS-JCF Document 11 Filed 05/05/2006 Page 4 of 4

The parties have conferred and their present best estimate of the length of trial of an individual plaintiff's case is approximately 3 weeks.

**SO ORDERED**

DATED: New York, New York
May 4, 2006

James C. Francis IV
James C. Francis IV
United States Magistrate Judge

# EXHIBIT L

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/15/06

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

BRIAN PORTERA, et al.,

Plaintiff,

-versus-

THE CITY OF NEW YORK, et al.

Defendants.

**CONSOLIDATED CASE MANAGEMENT ORDER**

05 CV 9985 (KMK)(JCF)

DOCKET IN BOTH CASES

---------------------------------------------------------------- x

MICHAEL REUBEN, et al.,

Plaintiff,

-versus-

THE CITY OF NEW YORK, et al.

Defendants.

05 CV 9987 (KMK)(JCF)

---------------------------------------------------------------- x

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court hereby enters its Case Management Order governing the foregoing cases. These cases arise from arrests and detentions by the New York City Police Department around the time of the Republican National Convention in New York City in late August and early September 2004 ("RNC Cases"). They involve numerous Defendants including the City of New York, its Mayor and Commissioner of Police.

In these cases, issue has been joined and all of the material allegations of the complaints have been denied. Defendants have stipulated to the following terms at this time to permit Plaintiffs in these actions the opportunity to participate in the consolidated discovery currently underway in the related RNC Cases. In the interests of the convenience and economy of the parties, and the efficient management and oversight of the Court's docket, the Court hereby enters this order, the provisions of which are designed to be compatible with those in the

RNC Case captioned *Macnamara, et al. v. The City of New York, et al., No. 04-CV-9216 (KMK) (JCF)* and others. In addition to this order, the parties are bound by (and the Court is entering in these cases separately) Discovery Order #1 (which provides for the consolidated depositions of certain defense witnesses) and Protective Order #1 (which provides for the confidential treatment of certain discovery materials).

The Court is advised that the parties do not consent to trial by magistrate judge. The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. All motions and applications shall be governed by the Court's Individual Practices, including pre-motion conference requirements. This order may be modified only by agreement of the parties, subject to the Court's approval, or upon a showing of good cause.

| ***DATE DUE*** | ***PLEADINGS & DISCOVERY*** |
|---|---|
| | The parties have agreed to dispense with initial disclosures and have commenced discovery. |
| 5/31/06 | The parties currently expect that the consolidated depositions of defense witnesses, as contemplated by Discovery Order #1, shall proceed at least through this date. |
| 6/1/06 | Plaintiffs shall have served any amended complaint adding claims or joining parties. No further amendment to the complaint shall be permitted without leave of court. |
| 8/1/06 | All written discovery, including document requests and interrogatories, shall have been served, except as provided below. |
| 11/1/06 | All depositions of fact witnesses shall have been noticed. With respect to both fact and expert witnesses, unless the noticing party assents, depositions of particular witnesses are not to be held until the party producing the witness has responded to any outstanding interrogatories and requests for documents pertaining to that witness. Once a party has completed the deposition of a witness, that party shall not later seek to re-depose that witness absent good cause. |

| | |
|---|---|
| 2/1/07 | All fact discovery shall have been completed. |
| 3/1/07 | Plaintiffs shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 4/1/07 | Depositions of plaintiffs' trial experts shall be completed. |
| 5/1/07 | Defendants shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 6/1/07 | Depositions of defendants' trial experts shall be completed. |
| 7/1/07 | All contention interrogatories and requests to admit shall be served. |
| 8/1/07 | All responses due to contention interrogatories and requests to admit. |
| 8/15/07 | All counsel must meet for at least one hour to discuss settlement no later than this date. |

Counsel for the parties have discussed holding a settlement conference before a Magistrate Judge. The parties request a settlement conference before a Magistrate Judge.

Counsel for the parties have discussed the use of the Court's Mediation Program. The parties do not request that the case be referred to the Court's Mediation Program.

Counsel for the parties have discussed the use of a privately retained mediator. The parties do not intend to use a privately retained mediator.

***DISPOSITIVE MOTIONS***

| | |
|---|---|
| 9/1/07 | All dispositive motions shall have been served. Pursuant to the undersigned's Individual Practices, the parties shall request a pre-motion conference in writing at least four weeks prior to this deadline. |
| 10/1/07 | Oppositions due to all dispositive motions. |
| 11/1/07 | Replies, if any, due to all dispositive motions. |
| Within 30 days of the Court's ruling on dispositive motions | Should any part of the case remain after the Court's ruling on dispositive motions, a Pre-Trial Conference with the Court shall be held. Prior to that conference, the parties shall consult and submit to the Court a Joint Pretrial Order prepared in accordance with the Undersigned's Individual Practices and Rule 26(a)(3) of the Federal Rules of Civil Procedure. If |

this action is to be tried before a jury, proposed voir dire, jury instructions and a verdict form shall be filed with the Joint Pretrial Order. Counsel are required to meet and confer on the jury instructions and verdict form in an effort to make an agreed upon submission.

The parties have conferred and their present best estimate of the length of trial of an individual plaintiff's case is approximately 2 weeks.

**SO ORDERED**

DATED: New York, New York
May 15, 2006

James C. Francis IV
James C. Francis IV
United States Magistrate Judge

# EXHIBIT M

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 11/9/05

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- x

ADAM WROBLEWSKI,

Plaintiff,

-versus-

THE CITY OF NEW YORK, et al.

Defendants.

---------------------------------------------------------------------- x

JEANETTE LAHN-SHEEN LEE, et al.

Plaintiffs,

-versus-

THE CITY OF NEW YORK, et al.

Defendants.

---------------------------------------------------------------------- x

JULIA R. COHEN,

Plaintiff,

-versus-

THE CITY OF NEW YORK, et al.

Defendants.

---------------------------------------------------------------------- x

CHRIS J. KORNICKE,

Plaintiff,

-versus-

THE CITY OF NEW YORK, et al.

Defendants.

---------------------------------------------------------------------- x

**CONSOLIDATED CASE MANAGEMENT ORDER**

05 CV 5150 (KMK)

05 CV 5528 (KMK)

05 CV 6780 (KMK)

05 CV 7025 (KMK)

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court hereby enters its Case Management Order governing the foregoing cases. These cases arise from arrests and detentions by the New York City Police Department around the time of the Republican National Convention in New York City in late August and early September 2004 ("RNC Cases"). They involve numerous named Plaintiffs and numerous Defendants including the City of New York, its Mayor and Commissioner of Police.

In these cases, issue has been joined (or will be joined shortly) and all of the material allegations of the complaints have been denied. The following schedule permits Plaintiffs in these actions the opportunity to participate in the consolidated discovery of Defendants scheduled to commence this fall in the related RNC Cases, as contemplated by the Court's Discovery Order #1 (entered on October 3, 2005), followed by a period of discovery of plaintiffs, non-consolidated defense witnesses and any other discovery in these actions.

The Court is advised that the parties do not consent to trial of this case by magistrate judge. The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. All motions and applications shall be governed by the Court's Individual Practices, including pre-motion conference requirements. This order may be modified only by agreement of the parties, subject to the Court's approval, or upon a showing of good cause.

| ***DATE DUE*** | ***PLEADINGS & DISCOVERY*** |
|---|---|
| | The parties have agreed to dispense with initial disclosures and have commenced discovery. |
| 12/1/05 | Plaintiffs shall have served any amended complaint adding claims or joining parties. No further amendment to the complaint shall be permitted without leave of court. |
| 2/1/06 | Depositions of Defendants' "Consolidated Witnesses," as set forth in the Court's Discovery Order #1, shall be completed. |
| 3/1/06 | All written discovery, including document requests and interrogatories, shall have been served, except as provided below. |
| 5/1/06 | All depositions of fact witnesses shall have been noticed. With respect to both fact and expert witnesses, unless the noticing party assents, depositions of particular witnesses are not to be held until the party producing the witness has responded to any outstanding interrogatories and requests for documents pertaining to that witness. Once a party has completed the deposition of a witness, that party shall not later seek to |

| | |
|---|---|
| | re-depose that witness absent good cause. |
| 6/1/06 | All fact discovery shall have been completed. |
| 7/1/06 | Plaintiffs shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 8/1/06 | Depositions of plaintiffs' trial experts shall be completed. |
| 9/1/06 | Defendants shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 10/1/06 | Depositions of defendants' trial experts shall be completed. |
| 11/1/06 | All contention interrogatories and requests to admit shall be served. |
| 12/1/06 | All responses due to contention interrogatories and requests to admit. |
| 12/15/06 | All counsel must meet for at least one hour to discuss settlement no later than this date. |
| | Counsel for the parties have discussed holding a settlement conference before a Magistrate Judge. The parties request a settlement conference before a Magistrate Judge. |
| | Counsel for the parties have discussed the use of the Court's Mediation Program. The parties do not request that the case be referred to the Court's Mediation Program. |
| | Counsel for the parties have discussed the use of a privately retained mediator. The parties do not intend to use a privately retained mediator. |
| | ***DISPOSITIVE MOTIONS*** |
| 1/1/07 | All dispositive motions shall be served. Pursuant to the undersigned's Individual Practices, the parties shall request a pre-motion conference in writing at least four weeks prior to this deadline. |
| 2/1/07 | Oppositions due to all dispositive motions. |
| 3/1/07 | Replies, if any, due to all dispositive motions. |
| Within 30 days of the Court's ruling on dispositive motions | Should any part of the case remain after the Court's ruling on dispositive motions, a Pre-Trial Conference with the Court shall be held. Prior to that conference, the parties shall consult and submit to the Court a Joint Pretrial Order prepared in accordance with the Undersigned's Individual |

Practices and Rule 26(a)(3) of the Federal Rules of Civil Procedure. If this action is to be tried before a jury, proposed voir dire, jury instructions and a verdict form shall be filed with the Joint Pretrial Order. Counsel are required to meet and confer on the jury instructions and verdict form in an effort to make an agreed upon submission.

The parties have conferred and their present best estimate of the length of trial of an individual plaintiff's case is approximately 2 weeks.

**SO ORDERED**

DATED: New York, New York
~~October~~ Nov. 9, 2005

James C. Francis IV
James C. Francis
United States Magistrate Judge

# EXHIBIT N

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 11/10/05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFREY BLACK,

Plaintiff,

-versus-

THE CITY OF NEW YORK, et al.,

Defendants.

CONSOLIDATED CASE MANAGEMENT ORDER

05 CV 3616 (KMK)

--- x

CATHIE L. BELL,

Plaintiff,

-versus-

THE CITY OF NEW YORK, et al.,

Defendants.

05 CV 3705 (KMK)

--- x

ELIZABETH STARIN,

Plaintiff,

-versus-

THE CITY OF NEW YORK, et al.,

Defendants.

05 CV 5152 (KMK)

--- x

STUART HABER,

Plaintiff,

-versus-

THE CITY OF NEW YORK, et al.,

Defendants.

05 CV 6193 (KMK)

--- x

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court hereby enters its Case Management Order governing the foregoing cases. These cases arise from arrests and detentions by the New York City Police Department around the time of the Republican National Convention in New York City in late August and early September 2004 ("RNC

Cases"). They involve numerous named Plaintiffs and numerous Defendants including the City of New York, its Mayor and Commissioner of Police.

In these cases, issue has been joined (or will be joined shortly) and all of the material allegations of the complaints have been denied. The following schedule permits Plaintiffs in these actions the opportunity to participate in the consolidated discovery of Defendants scheduled to commence this fall in the related RNC Cases, as contemplated by the Court's Discovery Order #1 (entered on October 3, 2005), followed by a period of discovery of plaintiffs in these actions.

The Court is advised that the parties do not consent to trial of this case by magistrate judge. The parties are to conduct discovery in accordance with the Federal Rules of Civil Procedure and the Local Rules of the Southern District of New York. All motions and applications shall be governed by the Court's Individual Practices, including pre-motion conference requirements. This order may be modified only by agreement of the parties, subject to the Court's approval, or upon a showing of good cause.

| ***DATE DUE*** | ***PLEADINGS & DISCOVERY*** |
|---|---|
| 12/30/05 | Plaintiffs shall have served any amended complaint adding claims or joining parties. No further amendment to the complaint shall be permitted without leave of court. |
| 2/1/06 | Depositions of Defendants' "Consolidated Witnesses," as set forth in the Court's Discovery Order #1, shall be completed. |
| 3/1/06 | All written discovery, including document requests and interrogatories, shall have been served, except as provided below. |
| 5/1/06 | All depositions of fact witnesses shall have been noticed. With respect to both fact and expert witnesses, unless the noticing party assents, depositions of particular witnesses are not to be held until the party producing the witness has responded to any outstanding interrogatories and requests for documents pertaining to that witness. Once a party has |

| | |
|---|---|
| | completed the deposition of a witness, that party shall not later seek to re-depose that witness absent good cause. |
| 6/1/06 | All fact discovery shall have been completed. |
| 7/1/06 | Plaintiffs shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 8/1/06 | Depositions of plaintiffs' trial experts shall be completed. |
| 9/1/06 | Defendants shall identify their expert witnesses for trial and provide the disclosures contemplated by the federal rules. |
| 10/1/06 | Depositions of defendants' trial experts shall be completed. |
| 11/1/06 | All contention interrogatories and requests to admit shall be served. |
| 12/1/06 | All responses due to contention interrogatories and requests to admit. |
| 12/15/06 | All counsel must meet for at least one hour to discuss settlement no later than this date. |
| | Counsel for the parties have discussed holding a settlement conference before a Magistrate Judge. The parties request a settlement conference before a Magistrate Judge. |
| | Counsel for the parties have discussed the use of the Court's Mediation Program. The parties do not request that the case be referred to the Court's Mediation Program. |
| | Counsel for the parties have discussed the use of a privately retained mediator. The parties do not intend to use a privately retained mediator. |
| | ***DISPOSITIVE MOTIONS*** |
| 1/1/07 | All dispositive motions shall be served. Pursuant to the undersigned's Individual Practices, the parties shall request a pre-motion conference in writing at least four weeks prior to this deadline. |
| 2/1/07 | Oppositions due to all dispositive motions. |
| 3/1/07 | Replies, if any, due to all dispositive motions. |
| Within 30 days of the Court's ruling on dispositive motions | Should any part of the case remain after the Court's ruling on dispositive motions, a Pre-Trial Conference with the Court shall be held. Prior to that conference, the parties shall consult and submit to the Court a Joint |

Pretrial Order prepared in accordance with the Undersigned's Individual Practices and Rule 26(a)(3) of the Federal Rules of Civil Procedure. If this action is to be tried before a jury, proposed voir dire, jury instructions and a verdict form shall be filed with the Joint Pretrial Order. Counsel are required to meet and confer on the jury instructions and verdict form in an effort to make an agreed upon submission.

The parties have conferred and their present best estimate of the length of trial of an individual plaintiff's case is approximately 2 weeks.

**SO ORDERED**

DATED: New York, New York
November 9, 2005

James C. Francis IV
James C. Francis
United States Magistrate Judge

# EXHIBIT O

MEMO ENDORSED

RECEIVED NOV 17 2006 CHAMBERS OF UNITED STATES MAGISTRATE JUDGE

Jeffrey A. Rothman
Attorney at Law
575 Madison Avenue, Suite 1006
New York, NY 10022
Tel.: (212) 348-9833; (212) 937-8450
Cell: (516) 455-6873
Fax: (212) 591-6343
jrothman@alumni.law.upenn.edu

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/20/06

November 17, 2006

By Hand
The Honorable James C. Francis IV
United States Magistrate Judge
United States District Court for the Southern District of New York
500 Pearl Street – Room 1960
New York, NY 10007

Re: *Phillips, et al. v. City of New York, et al.* 05 Civ. 7624 (KMK) (JCF);
*Coburn, et al. v. City of New York, et al.*, 05 Civ. 7623 (KMK) (JCF);
*Sloan, et al. v. City of New York, et al.*, 05 Civ. 7668 (KMK) (JCF);
*Galitzer v. City of New York, et al.*, 05 Civ. 7669 (KMK) (JCF);
*Bastidas, et al. v. City of New York, et al.*, 05 Civ. 7670 (KMK) (JCF);
*Carney, et al. v. City of New York, et al.*, 05 Civ. 7672 (KMK) (JCF);
*Sikelianos v. City of New York, et al.*, 05 Civ. 7673(KMK) (JCF);
*Jarick v. City of New York, et al.*, 05 Civ. 7626 (KMK) (JCF);

Please Docket in all cases

Dear Judge Francis:

I write to respectfully request, jointly with counsel for defendants, an additional extension of ~~4~~ 3 months on all remaining deadlines pursuant to the Case Management Orders in the above-captioned RNC cases. Pursuant to Your Honor's Discovery Order #2 of November 13, 2006, the parties are in the process of setting up dates for the depositions of twenty-seven "Arresting Officers" over the course of the next several months in the above-captioned cases. In addition to these, a significant number of Commanding Officer depositions, and depositions of officials of the Hudson River Park Trust, will need to be scheduled in the above-captioned cases, in conjunction with the resolution of other discovery issues associated therewith.

yes

This is the parties' third joint request for an extension of the Case Management Orders in the above-captioned cases.

Respectfully submitted,

Jeffrey Rothman

11/17/06
Application granted as modified. No further extensions.
SO ORDERED.
James C. Francis IV
USMJ

cc: James Mirro, Esq. (by email)
Fred Weiler, Esq. (by email)
Jeffrey Dougherty, Esq. (by email)
Curt Beck, Esq. (by email)

**MEMO ENDORSED**

THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

MICHAEL A. CARDOZO
*Corporation Counsel*

FRED M. WEILER
*Special Federal Litigation Division*
*TEL 212-788-1817*
*FAX: 212-788-9776*

March 2, 2007

**VIA FAX 212-805-7930**
Honorable James C. Francis IV
United States Magistrate Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 3/5/07

Re: Drescher v. City of New York et al, 05 CV 7541 (KMK) (JCF)

Dear Judge Francis:

On behalf of plaintiff and defendants, I write to request a modification of the Case Management Order (CMO) in the above-captioned case, which currently provides for a fact-discovery cut-off date of March 1, 2007. Both sides are exchanging written discovery, but need additional time for fact discovery. Accordingly, plaintiff and defendants jointly request that the Court grant an extension to the CMO deadlines such that fact discovery would be completed by July 1, and the remaining CMO deadlines extended by ~~4~~ (2) months. In addition, plaintiff had been *pro se*, but only recently retained an attorney. If this meets with your approval, would you please "so order" it?

Thank you for your time and consideration.

Respectfully submitted,

Fred M. Weiler (FW 5864)

Application granted as modified. No further extensions.
SO ORDERED.
James C. Francis IV
USMJ
3/5/07

cc: Jeffrey Rothman, Esq. (via e-mail)

# EXHIBIT P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------x

MICHAEL SCHILLER, FRANCESCA FIORENTINI,
ROBERT CURLEY AND NEAL CURLEY,
Plaintiffs,

-against-

THE CITY OF NEW YORK;
RAYMOND KELLY, Commissioner
of the New York City Police
Department; TERENCE MONAHAN,
Assistant Chief of the Bronx
Bureau of the New York
City Police Department, et al.,
Defendants.
--------------------------------------x

December 1, 2005
10:00 a.m.

Deposition of TERENCE MONAHAN, held at the offices of NEW YORK CIVIL LIBERTIES UNION, 125 Broad Street, New York, New York, before Vicky Galitsis, a Certified Shorthand Reporter and Notary Public of the State of New York.

GREENHOUSE REPORTING, INC.
363 Seventh Avenue - 20th Floor
New York, New York 10001
(212) 279-5108

A P P E A R A N C E S:

NEW YORK CIVIL LIBERTIES UNION
Attorneys for the Plaintiffs
125 Broad Street
New York, New York 10004
BY: CHRISTOPHER DUNN, ESQ.,
of Counsel

LESLIE L. LEWIS, ESQ.
Attorney for the Plaintiff Concepcion
162 West 21st Street, 2 So
New York, New York 10011
-and-
KAREN WOHLFORTH, ESQ.
299 Broadway, Suite 1705
New York, New York 10007

MICHAEL L. SPIEGEL, ESQ.
Attorney for the Plaintiffs
Abdell, et al
111 Broadway, Suite 1305
New York, New York 10006

ALAN LEVINE, ESQ.
Attorney for the
Plaintiffs Abdell, et al
207 West 106th Street, Suite 11C
New York, New York 10025

ALAN D. LEVINE, ESQ.
Attorney for the Plaintiffs
Meehan, et al
80-02 Kew Gardens Road, Suite 1010
Kew Gardens, New York 11415

JEFFREY A. ROTHMAN, ESQ.
Attorney for the
Plaintiffs Coburn, et al
575 Madison Avenue, Suite 1006
New York, New York 10022

A P P E A R A N C E S:

ALLEGAERT BERGER & VOGEL, LLP
Attorneys for the
Plaintiff Noel Grosso
111 Broadway, 18th Floor
New York, New York 10006
BY: ROBERT F. FINKELSTEIN, ESQ.,
of Counsel

MOORE & GOODMAN, LLP
Attorneys for the
Plaintiffs MacNamara, et al
99 Park Avenue, Suite 1600
New York, New York 10016
BY: DAVID MILTON, ESQ.
WILLIAM GOODMAN, ESQ.

LAW OFFICES OF SUSAN TAYLOR
Attorneys of the
Plaintiffs Abdell, et al
575 Madison Avenue, 10th Floor
New York, New York 10022
BY: NORMAN BEST, ESQ.,
Of Counsel

AMERICAN CIVIL LIBERTIES UNION
Attorneys for the
Plaintiffs Abdell, et al
125 Broad Street, 18th Floor
New York, New York 10004-2400
BY: RICK BEST, ESQ.,
of Counsel

A P P E A R A N C E S:

JAMES J. MEYERSON, ESQ.
Attorney for the
Plaintiff Carol Dudek and others
396 Broadway
New York, New York 10013

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
Attorneys for the Defendants
100 Church Street
New York, New York 10007-2601
BY: JAY A. KRANIS, ESQ.
JEFFREY DOUGHERTY, ESQ.
FRED M. WEILER, ESQ.

POLICE DEPARTMENT SPECIAL COUNSEL
Attorneys for the Defendants
One Police Plaza, Room 1406A
New York, New York 10038
BY: RUBY MARIN, ESQ.
S. ANDREW SCHAEFFER, ESQ.

T. Monahan

T E R E N C E M O N A H A N,
having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY MR. DUNN:

Q. Good morning.
A. Morning.
Q. Thank you for joining us. For better or for worse, this is not going to be a short process. So as Mr. Kranis may have told you, this is going to be more than a one-day event.
We are going to go until 4 o'clock today, and then we will agree upon a date that's convenient for everyone for the continuation of this deposition.
MR. DUNN: The City is representing Chief Monahan, correct?
MR. KRANIS: Yes.
Q. Chief, have you previously been deposed?
A. In this case?
Q. No, in any case.

Page 70

T. Monahan

of how the police would deal with demonstration activity.

A. Yes.

Q. So what do you recall, if anything, him talking about in terms of the legal aspects of dealing with demonstrations?

A. Specifically I cannot recall exactly what he said. But I know we did discuss stuff along the lines of blocking streets, blocking buses, stuff along those lines. Exactly what was discussed, I don't recall.

Q. When you talk about blocking streets, are you talking about people either sitting down or lying in a roadway?

A. No. Blocking streets, blocking it in any way, manner, shape or form.

Q. In a roadway, is that correct?

A. Street, building line to building.

Q. Building line to building line. So you are including sidewalks within that?

A. Yes.

Q. What do you recall, if anything,

Page 71

T. Monahan

about Captain Sweet saying on this topic?

A. I don't recall what he said.

Q. Do you have any general recollection about what he said about blocking buses?

A. I don't recall exactly, no.

Q. Did he make a PowerPoint presentation in conjunction with his training?

A. I don't recall.

Q. Were you provided with any written materials with respect to this training session, on any topic?

A. Yes.

Q. What materials were you provided?

A. Legal guidelines.

Q. Is this a publication by the legal bureau about guidelines to be used during the convention?

A. It was a guideline, I believe, just of the overall laws regarding free speech, public assemblage and of such.

Q. How many pages would you estimate that was?

A. It was fairly substantial.

Page 72

T. Monahan

Q. I will show that to you later.

A. Okay.

Q. Any other written materials you recall receiving during that training?

A. That's the only one I recall. I may have received others, but I do recall that.

Q. What do you recall, if anything, about any discussion at that training by Kerry Sweet or anyone else about the need for people who are walking on a sidewalk to get a permit?

A. I don't recall him mentioning that.

Q. You said there were three training sessions that you believe you attended. The first one was approximately the Spring of 2004. When was the next one?

A. The next one was early Summer of 2004. Early or later summer, maybe end. Sometime of July, beginning of July.

Q. Where did that training take place?

A. Down at headquarters.

Q. By headquarters, you mean One PP?

Page 73

T. Monahan

A. Yes.

Q. Where at One PP did that training take place?

A. The auditorium.

Q. Was it a full group of people at the auditorium?

A. Yes.

Q. Do you have any idea how many that auditorium seats, approximately?

A. No.

Q. Do you have any idea who was in attendance at that training? Again I don't mean by identity, I mean by category, either by rank or type of responsibility, any way that you can describe them as a group.

A. Superior officers from the rank of captain up. Who was invited, I'm not sure.

Q. How long did that training last?

A. I believe it was a couple of hours.

Q. What was the substance of that training?

A. It was a briefing by the intelligence bureau.

Page 74

T. Monahan

Q. Was that provided by Commissioner Cohen?

A. Yes.

Q. Did any aspect of that briefing concern any aspect of the policing of demonstrations?

A. The policing of, no.

Q. Again I want to be clear. Any aspect of interaction between police officers and people involved in protest activity?

A. No.

Q. No discussion about that?

A. No. We had the discussion --

Q. I take it that means there was no discussion about intelligence the police department believed it had received about potential disruptive behavior in conjunction with demonstrations?

MR. KRANIS: You can answer yes or no.

A. Yes.

Q. It did include that?

A. Yes.

Q. From my perspective, that would

Page 75

T. Monahan

include some aspect of the policing of demonstrations. Again I want to try to emphasize to you when I am asking you questions about the policing of demonstrations I mean that in the broadest of terms.

A. Normally I take the concept of policing demonstrations, how we're going to respond to a group.

Q. I am talking about everything from how you plan, to what you know in advance, to how you think about what you are going to do, to what you did, to what you did after you did it.

A. Okay.

Q. What discussion was there at that briefing about the policing of demonstrations, in the broadest sense?

MR. KRANIS: To the extent that the question asks for and/or the answer would require direct recitation or advice about what Commissioner Cohen told the assemblage on the basis of intelligence, I will object and instruct the witness not to answer.

Page 76

T. Monahan

MR. DUNN: To that extent, that's fine.

Q. Why don't you try to do it within those parameters?

MR. KRANIS: Don't tell them anything about what Commissioner Cohen told you about the intelligence that he had about any groups or about the RNC in general.

MR. DUNN: That's a little too broad. You don't want him to disclose specific information about specific events, that's one thing. But he certainly, I think, can talk about -- he can categorize what was discussed.

MR. KRANIS: I don't have any problem with that.

MR. DUNN: Let's start with that and then we will go and you can tell him when to stop.

MR. KRANIS: Okay. Stop.

Q. Setting aside what he may have said about any particular group or about any particular piece of intelligence, what was the

Page 77

T. Monahan

general substance of the information he conveyed to you during this briefing as it relates to the policing of demonstrations during the convention?

A. Groups that they believe would be attending the demonstration, tactics they had used in the past.

Q. Tactics the groups had used?

A. Yes. A lot of it was on what groups he thought were going to be there and tactics they had used in the past.

Q. Just so I'm clear about this, I take it from what you are saying that Commissioner Cohen is talking about groups other than the organizers of an event who might show up in an event and then might deploy certain tactics that specific group showing up at the event had used at some prior occasion, is that correct?

MR. KRANIS: I object to the form of the question. Can you just try to rephrase it?

Q. Did you understand what I was saying?

Page 78

T. Monahan

(Record read.)

A. I don't know if these were organizers or non-organizers, but these were groups that were showing up.

Q. So your recollection was this might have encompassed not only people showing up at someone else's event, but people who are actually planning the event itself?

A. Yes.

Q. Did the presentation that he made at that time get down to the level of a discussion about particular events?

A. No. Can I ask counsel?

MR. DUNN: Of course.

(Witness and counsel confer.)

A. There was mention about a date, August 31st, that the groups had been planning for a day of civil disobedience and potential violence.

Q. Beyond August 31st, was there discussion about events scheduled for any other date?

A. No.

Q. With respect to August 31st

Page 79

T. Monahan

itself, was there discussion about particular groups who might engage in these tactics?

MR. KRANIS: You can answer yes or no.

(Record read.)

A. They were of the opinion that all the groups were going to focus on August 31st.

Q. I understand that. I understand you are talking about August 31st. I am talking with respect to that particular date.

Was there, as part of Commissioner Cohen's presentation, a discussion of specific groups who on that date the department expected to engage in unlawful tactics?

A. As I said, they expected all the groups to participate in unlawful tactics on that date.

Q. So are you saying that the expectation was that everyone engaged in a demonstration on August 31st was expected to engage in unlawful behavior?

A. No.

Q. That's what I'm trying to focus

Page 80

T. Monahan

on. How much of a focus was on specific groups that might participate in unlawful behavior?

A. There was no focus on what groups were going to do unlawful activity on that date.

Q. Would it be fair to say, as you recall it, the presentation there was to the effect that the department expected on August 31st that there would be a number of groups who might be engaged in unlawful activity?

A. Yes.

THE WITNESS: Can we take a break shortly?

MR. DUNN: We can take a break right now if you like.

(Recess: 11:28 to 11:39 a.m.)

BY MR. DUNN:

Q. Chief Monahan, was there any discussion, at this training session that we've been discussing, about specific events at which these tactics might be used?

A. No.

Page 81

T. Monahan

Q. What written materials, if any, were given out at this event?

A. None that I recall.

Q. Was there a PowerPoint presentation that was made?

A. Yes.

Q. Was that a PowerPoint presentation that was made in conjunction with Commissioner Cohen's presentation?

A. Yes.

Q. Other than the presentation that was made about intelligence, was there any other topic discussed at this briefing?

A. No.

Q. The prior briefing you mentioned Chief McManus had given a presentation about, I think you said, an overview of the RNC.

By that were you referring to an overview of the policing of the convention, or are you talking about something broader?

A. Something broader; the various portions of the convention, inner perimeter, outer perimeter, transit, hotels, transportation, mobile field forces, the

Page 242

T. Monahan

on it.

MR. DUNN: This copy I have does not have the Bates number on it, but I will make sure the record includes a statement about the Bates number that's on it.

MR. KRANIS: Okay.

MR. DUNN: Okay. Off the record.

(Discussion off the record.)

MR. DUNN: I just want to note for the record that we're going to adjourn the deposition now with the consent of everyone, and we will continue it at a mutually convenient date that we will have to designate.

MR. SPIEGEL: If I may say on the record, throughout both this deposition and at times during Inspector Galati's deposition, instructions not to answer questions were issued by Mr. Kranis.

And while neither I nor any of the other plaintiffs' counsel in the room spoke up, we will have objected collectively to those instructions and

Page 243

T. Monahan

we will take them up at later time.

MR. KRANIS: I understood that you did not agree with me.

(Time noted: 1:35 p.m.)

Page 244

T. Monahan

I, the witness herein, having read the foregoing testimony do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

________________________

TERENCE MONAHAN

Subscribed and sworn to before me this______day of_______________, 2005.

________________________

Page 245

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| T. Monahan | Mr. Dunn | 5 |

EXHIBITS

| MONAHAN | | PAGE | LINE |
|---|---|---|---|
| 1 | Violation, Bates stamped SCH 15 | 231 | 3 |
| 2 | Violation | 232 | 3 |
| 3 | Document Bates stamped Schiller 21 and 22 | 232 | 22 |
| 4 | Document Bates stamped SCH 1 and 2 | 233 | 20 |

# EXHIBIT Q

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------x

MICHAEL SCHILLER, et al.,
Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,
Defendants.
-----------------------------------x

HACER DINLER, et al.,
Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,
Defendants.
-----------------------------------x

July 7, 2006
10:00 a.m.

Deposition of JOSEPH ESPOSITO, held at the offices of NEW YORK CIVIL LIBERTIES UNION, 125 Broad Street, New York, New York, before Vicky Galitsis, a Certified Shorthand Reporter and Notary Public of the State of New York.

GREENHOUSE REPORTING, INC.
363 Seventh Avenue - 20th Floor
New York, New York 10001
(212) 279-5108

A P P E A R A N C E S:

NEW YORK CIVIL LIBERTIES UNION
Attorneys for the Plaintiffs
Michael Schiller, et al and
Hacer Dinler, et al.
125 Broad Street
New York, New York 10004
BY: CHRISTOPHER DUNN, ESQ.,
-and
PALYN HUNG, ESQ
of Counsel

LAW OFFICES OF SUSAN TAYLOR
Attorneys for the Plaintiffs
Abdell, et al.
575 Madison Avenue, 10th Floor
New York, New York 10022
BY: NORMAN BEST, ESQ.,
of Counsel

ALLEGAERT BERGER & VOGEL, LLP
Attorneys for the Plaintiff
Noel Gross
111 Broadway, 18th Floor
New York, New York 10006
BY: ROBERT F. FINKELSTEIN, ESQ.,
of Counsel

OLIVER & OLIVER, ESQS.
Attorneys for the Plaintiff
Dennis Kyne
c/o 200 East 10th Street, #917
New York, New York 12202
BY: ERIC ADLER, ESQ.,
of Counsel

A P P E A R A N C E S: (Continued.)
ALAN D. LEVINE, ESQ.
Attorney for the Plaintiff
Greta Smith, et al
80-02 Kew Gardens Road, Suite 1010
Kew Gardens, New York 11415

ZELDA STEWARD, ESQ.
Attorney for the Plaintiff
Jody Concepcion
299 Broadway, 17th Floor
New York, New York 10007

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
Attorneys for the Defendants
100 Church Street
New York, New York 10007-2601
BY: PETER FARRELL, ESQ.
-and-
MARK ZUCKERMAN, ESQ.,
of Counsel

ANDREW SCHAFFER, ESQ.
Deputy Commissioner Legal Matters
One Police Plaza, Room 140A
New York, New York 10038
(present a.m. session)

RUBY MARIN, ESQ.
Special Counsel to Deputy
Commissioner Legal Matters
One Police Plaza, Room 140A
New York, New York 10038
(present p.m. session)

ALSO PRESENT:
Brian Derr, NYC Law Department Intern

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that all objections, except as to form, shall be reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the within deposition are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be subscribed and sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this deposition was begun.

-oOo-

E. Esposito

J O S E P H  E S P O S I T O, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY MR. DUNN:

Q. Good morning, Chief Esposito.
A. Good morning.
Q. A couple of preliminaries. First, as I assume you understand, you're not a defendant in this case. There is no allegation of wrongdoing on your part.
When did you learn you would be deposed in this matter?
A. I don't remember.
Q. Approximately how long ago would you say?
A. A couple of months.
Q. Since learning you would be deposed, have you had conversations with anyone from inside the police department about this deposition?
A. Yes.
Q. With whom have you had those

Page 182

E. Esposito

specifically. That's my point.

Q. I understand. Let's be clear about that. I understand you may not remember the particulars as to the when or the where, or even the who was there.

But is it correct that as you sit here today, you do recall participating in a meeting where at least Commissioner Kelly was present where this particular decision was made?

A. Correct.

Q. What was the reason for the department deciding to have a no summons policy during the convention?

MR. FARRELL: Objection. He went through all these factors in this morning's testimony.

MR. DUNN: He identified a bunch of factors that might be circumstances under which such a decision might be made for a particular event. It wasn't particular to the convention.

MR. FARRELL: He spent a considerable amount of time testifying

Page 183

E. Esposito

about those factors. You can ask him if any of those factors weren't applicable.

You asked him quite a lengthy series of questions about the reasons why a no summons policy was utilized.

MR. DUNN: No, it was not a question about the convention. It was a question about the general policy.

Q. Chief Esposito, why was a no summons policy adopted for the convention?

MR. FARRELL: I'm going to object and I'm going to put a note on the record that he's previously testified about the reasons why.

A. Okay. There is a number of reasons why. Information about -- from intelligence, open sources that people were going to come to the City during the RNC for the purpose of shutting down the City, shutting down the RNC, committing criminal acts. They were going to come with false IDs, with no IDs. A lot of people from out of state would come in.

Page 184

E. Esposito

We knew from intelligence sources that a lot of people with past criminal history would come in and attempt violent acts. There was a threat of terrorism, that intel was telling us this would be a good venue for a terrorist attack.

We want to stop the criminal activity from continuing. A C summons is not the best way to do that many times. I think that's all. I may have missed one or two.

Q. Okay. Were these considerations that were discussed at this meeting where the decision was made?

A. Yes. The best possible prosecution was taken into consideration. You need a proper identification to go forward with a prosecution. Especially if a lot of these people were coming in from out of the City.

Q. I take it that the issue of giving summonses to people who were from out of the City or out of state is an issue that the police department deals with every day?

A. That's correct.

Page 185

E. Esposito

Q. Is it fair to say that the department's standard summons policies and procedures specifically take into account considerations about people being from out of the City or out of the state?

MR. FARRELL: Objection.

A. I'm sorry?

(Question read.)

A. Yes.

Q. Did you and Commissioner Kelly and perhaps First Deputy Commissioner Grosso give any consideration to applying this policy to particular events, as opposed to the entire RNC?

MR. FARRELL: Objection.

A. Every incident is separate from the other. An incident commander could have made any recommendation he or she wanted. An incident commander on the scene of an incident could have made a recommendation. But we have to rely on our incident commanders for the best course of action.

Q. I understand that. But this is a decision that was not made by an incident

E. Esposito

commander, this was a decision that was made by you and Commissioner Kelly.

A. Right.

Q. What I'm asking you is, when the two of you made this decision, what consideration, if any, did you give to having this policy apply to particular events where there were particular concerns as opposed to having it apply throughout the convention to all events?

A. That's always an option.

MR. FARRELL: Objection.

Q. Is that an option that you considered?

MR. FARRELL: Objection. If you are asking him about his discussions with Commissioner Kelly as a deliberative process as to why this was adopted, you can ask him what the policy was and why they adopted it. He's given you both.

I think you're trying to get at the conversations leading up to the adoption of the policy. And I'm going

E. Esposito

to assert the deliberative process on behalf of the City.

It's clearly stated what the policy was, and he articulated twice now, once this morning and once this afternoon, the reasons why the policy was adopted.

Q. Chief Esposito, do you recall if at the time this decision was made that you believed that the concerns that you mentioned were concerns that would apply to every single planned RNC event?

A. Generally speaking, this would be the policy. But incident commanders, anybody on the scene could bring it to our attention that they wanted to not put somebody into the system and give a DAT.

We give our commanders a lot of leeway to make the decisions based on the facts at that particular incident. We're not at every incident, we have to rely on our incident commanders.

Q. Is it your testimony that when the operations people were instructed that

E. Esposito

there would be a no summons policy during the convention, that they were also informed or otherwise would have known that they nonetheless would have had the discretion to issue summonses to people?

MR. FARRELL: Objection.

A. It's always an option. They can always bring that to our attention. Was it articulated? It doesn't have to be articulated.

Q. What does that mean? For instance, let's just take an example. We had a client whose case we settled, so it's not a case anymore. A single person who got arrested standing on the sidewalk, they went to Pier 57.

If the captain who had ordered that arrest had been inclined to give this woman a summons who was charged with blocking the sidewalk or standing on it, what would he have to have done to get permission to make an exception to the no summons policy?

MR. FARRELL: Objection.

A. Bring it to a supervisor's

E. Esposito

attention.

Q. What supervisor did you understand had the authority to make the exception to the no summons policy you and Commissioner Kelly made?

A. Every situation is different.

Q. I understand every situation is different. I'm trying to understand who would have had the authority to say --

A. Depending on the situation, it could have been that captain or it could have been me. It depends on the circumstances that are developing as that situation is unfolding.

Q. So I want to understand what the circumstances would have been at the convention, in which a captain could have decided to make an exception to the no summons policy that you and Commissioner Kelly made.

A. We're talking hypothetically.

MR. FARRELL: Objection.

A. What I'm telling you is that a captain could articulate to me a circumstance where he gave or she gave a summons.

Chief, I gave this summons

Page 190

E. Esposito

because A, B, C, and D.

Okay. Or I'd say, I don't like it, don't do it again.

So every situation is different. And if articulated it can be approved or not approved.

Q. Do you know of a single instance in which a summons was given to anyone arrested in conjunction with the convention?

MR. FARRELL: Objection.

A. I don't recall any. There may have been, I don't recall.

Q. I want to go back to the decision that you and Commissioner Kelly made. The question I started with was at the time you made that decision, did you have reason to believe that the factors that you identified as the basis for the policy applied to, in some form, every single event that was scheduled to take place during the convention?

MR. FARRELL: Objection.

A. Again every event is individual. As I've said, we leave it to the incident commander.

Page 191

E. Esposito

Q. But in this incident you didn't leave it to the incident commanders, you established a policy for the entire convention?

A. General policy, that's correct.

Q. General policy. So it was a general policy that apparently was adhered to with respect to all 1800 and some odd arrests that took place during the convention?

A. I don't know. There may have been summonses.

Q. There may have been, not that any of us knows of.

MR. FARRELL: Objection.

A. I don't know, I haven't checked.

Q. The question I'm asking you is when you made the decision to have a general policy, did you have reason to believe at that time that the concerns that you articulated as justifying the policy, were concerns that were applicable to all of the events that were scheduled to take place during the convention?

MR. FARRELL: Objection.

A. Every incident is an individual

Page 192

E. Esposito

incident that can be judged a number of different ways. It was a general policy that no C summonses would be issued. That's how we go into it.

There are exceptions to the policy. And we leave that to the incident commander at whatever venue he or she is at to say the general rule is no C summonses, we're going to DATs. Or if they want to articulate an exception, they can.

And I don't doubt that they did. I just don't have it here. You're saying they didn't. I don't know. Maybe they did.

Q. Let's start with the UFPJ event that was the big march on Sunday.

A. Sunday the 29th?

Q. The 29th. That's exactly the date.

Which of the concerns which you articulated as being the basis of the policy were concerns that you had with respect to that particular event?

MR. FARRELL: Objection. He's identified these reasons as the basis

Page 193

E. Esposito

for adopting the policy. He said that they applied it to the entire RNC period. He hasn't specified it by event.

MR. DUNN: Well, now I'm asking him to.

MR. FARRELL: If you understand the question -- again, I don't understand the question. Objection.

A. Are you saying which of my reasons that helped my decision to make no C summonses came into play during this event, is that what you're saying?

Q. That's not quite what I'm saying. Let's start with that. We can start with that one.

A. Okay.

MR. FARRELL: Objection.

A. Give me the question again, please. I'm sorry.

Q. Which, if any, of the concerns that you identified as being justifications for the no C summonses policy during the convention were concerns that you specifically

Page 194

E. Esposito

had with respect to the United for Peace and Justice event scheduled for August 29th?

A. They all had potential.

Q. They all had potential for what?

A. To be part of that event. All the concerns that I talked about had potential to be involved with that event.

Q. So for instance, you started off by saying if you had intelligence or information, the people were coming for the purpose of shutting down the RNC?

A. Correct.

Q. What was it about this event that led you to believe that participants in this event were there to shut down the RNC, which was not scheduled to start until the next day?

A. The intelligence that we got, that that is what a large part of the demonstrators coming to New York City were going to try and do.

Was it beyond the realm of responsibility that they would crash through the front of the Garden, that we let them march, take it over?

Page 195

E. Esposito

Q. As soon as they did that, they would it not be eligible for a summons?

A. That's correct.

Q. We have to remember we're focusing on people that were getting charged with things like disorderly conduct and parading without a permit.

A. I'm looking at the whole event, I'm looking at the potential with those things that I articulated. That's how I police it, by looking at the whole event taking those things into consideration.

Q. When a decision was made about adopting a no summons policy, were there any documents that were prepared that spelled out the justifications for that policy?

A. I don't think so. Not that I recall.

Q. Were there any documents that you recall discussing any aspect of the decision to adopt a no summons policy?

A. Not that I recall.

Q. When the decision was made to have a no summons policy, was there a

Page 196

E. Esposito

discussion about the impact that would have on the length of time people would be kept in police custody?

A. Yes.

Q. Was it recognized then that the people would be in police custody much longer than if the policy were not in place?

MR. FARRELL: Objection.

A. They would be in the system longer, they would be in our custody longer. Yeah, that was recognized.

Q. Was that recognized by Commissioner Kelly?

A. Yes.

Q. At the time that the decision was made about there being a no summons policy for the convention, was there a discussion about the impact it would have on the resources needed to process arrestees?

A. Yes.

Q. Was it recognized that greater resources would be needed, since everyone would be going at least through a DAT step?

A. Yes.

Page 197

E. Esposito

Q. What, if any, decisions were made to address the need for additional arrest processing resources, given the no summonses policy?

A. What steps were taken?

(Question read.)

A. We developed the system that was put in place to process the arrests.

Q. I take it by that you mean that the arrest processing plan that was put together by the department was specifically done in recognition of the fact that the no summonses policy would require additional arrest processing resources?

A. No. That was one of the aspects.

Q. I don't mean that was the sole consideration.

A. That's what you said.

Q. If I did, I didn't mean to say that.

A. Okay.

Q. That was one of the considerations in the design of the arrest possess for the convention?

Page 354

J. Esposito
A. I am sorry?
Q. In the normal circumstance outside of a mass-arrest situation, outside of a demonstration-related situation, when somebody is arrested for a violation for a quality-of-life crime, they are issued a summons, they are not issued a Desk Appearance Ticket or put through the system if they are summons-eligible, correct?
MR. FARRELL: Objection.
A. If they are eligible, correct.
Q. And they spend maybe a hour in custody based upon that, correct?
MR. FARRELL: Objection.
A. For a C summons?
Q. Yes. For the processing didn't you say that usually took around a hour?
A. It depends. You know, we do warrant checks now. So it could be 10 minutes. It could be up to a hour. I think that is the longest.
Q. But that is the time area we are talking about, 10 minutes, an hour, somewhere in that area?

Page 355

J. Esposito
A. I think an hour is somewhat in the longest.
Q. Certainly not 24 hours?
A. Correct.
Q. And certainly not 48 hours?
A. Correct.
Q. During the Republican National Convention people were spending 24 hours in jail or 48 hours in jail arrested for offenses that normally they would receive a C summons for and be out in the area of about 10 minutes to an hour, no?
MR. FARRELL: Objection.
A. No.
Q. Explain the distinction. Is that because -- explain why not, sir?
A. Because you are equating an individual with a quality-of-life offense on the street to a what you call a mass-arrest situation. Mass-arrest situation prior to the RNC the vast majority were no-C-summons strategy enforcement.
Q. Let me stop you there.
Is not the comparison I was making

Page 356

J. Esposito
in a normal situation, a non-mass situation, if somebody is arrested for Parading Without a Permit or Disorderly Conduct Subsection 5 or Disorderly Conduct Subsection 6 and they were summons-eligible, no problems with their identification or anything like that, they would normally receive their summonses in somewhere in the area of 10 minutes to an hour, correct?
MR. FARRELL: Objection.
A. For Disorderly Conduct, yes. I'm not sure for Parading Without a Permit.
Q. Let's just take Disorderly Conduct since you are sure about that. During the Republican National Convention, somebody arrested for Disorderly Conduct Subsection 5 or 6 could have spend 24 hours, 36 hours, 48 hours in custody before being released for that same offense, correct?
A. Correct.
MR. FARRELL: Objection.
A. Correct.
Q. Is it ever appropriate to arrest somebody if they hadn't committed a crime?
A. No.

Page 357

J. Esposito
Q. What intelligence did you have that suggested that people were coming to engage in continuous unlawful conduct?
A. Briefings from my Intelligence Division, briefing and information from my Intelligence --
Q. Given directly to you?
A. Yes.
Q. And given to your subcommittee?
A. At times.
Q. What intelligence information was given to you specifically about people continuing to engage in continuous unlawful acts?
A. Just that.
Q. Well, what acts and what people and where?
A. I don't recall right now.
Q. You don't have any details at all in your memory about any of the intelligence specifics that underlaid the intelligence conclusion that people were coming to engage in continuous unlawful activity?
MR. FARRELL: Objection.

J. Esposito

A. What you are saying was articulated to me, that groups were going to come into the City and engage in lawful activity, a variety of unlawful activity. Everything from possible bombing to assaults to civil disobedience.

Q. Who was in charge of gathering this information and briefing you from the Intelligence Division?

A. Well, the Commissioner of Intelligence, David Cohen, is the number one person, but at other times members of his staff would brief me.

Q. Can you remember the names of any of his staff members who briefed you in intelligence issues in anticipation of the Republican National Convention?

A. Kevin Perham, P-E-R-H-A-M. I forget the others.

Q. How many times were you briefed independently in a one-on-one conversation by either Mr. Cohen or his subordinates within the Intelligence Division about intelligence matters regarding the Republican National Convention?

A. I don't recall now.

J. Esposito

Q. Would you estimate it at more than five, less than five?

A. More than five.

Q. More than ten?

A. It's tough to guess.

Q. Well, about 50 times or somewhere in the area of five to a dozen, some estimate of the amount of time?

MR. FARRELL: Objection. If you know.

A. More than five. That is for sure.

Q. These are one-on-one conversations, correct?

A. Yes.

Q. How many times did the Intelligence Division, Mr. Cohen or one of his subordinates brief the Executive Committee about intelligence that has been garnered with regard to the Republican National Convention and what was expected to be coming during --

A. More than five.

Q. The same, if you give me an upper amount?

A. No, I couldn't.

J. Esposito

Q. When you say intelligence, does that include information garnered from open sources, do you make a distinction between open sources of information and intelligence that is gathered?

A. I am talking about both.

Q. So within that category, just so we are on the same page in terms of terminology, is it fair to say non-open source intelligence and intelligence based upon open source?

A. Yes.

Q. Do you have any specific recollection of any of the specific individuals who were expected to the come to New York City during the Republican National Convention and engage in continuous unlawful activity?

MR. FARRELL: Objection.

A. At the time --

MR. FARRELL: I want to consult with my client and see if that calls for any law enforcement privilege.

(Recess taken.)

THE WITNESS: I am sorry. Will you repeat it.

J. Esposito

MR. ROTHMAN: Could you read it back.

(Record read.)

A. I don't recall the specific names. Names were given to me. I don't recall them now.

Q. How many times were you briefed personally by Mr. Cohen on this subject?

MR. FARRELL: Objection.

A. I don't recall.

Q. Less than five?

MR. FARRELL: Objection.

A. I would say more than five, but other than that I really couldn't give an educated guess.

Q. How many times did Mr. Cohen brief the Executive Committee on this subject of intelligence related to the Republican National Convention?

MR. FARRELL: Objection.

A. I don't recall.

Q. Again more than five, you would estimate?

A. Yes.

J. Esposito

Q. In terms of number of weeks or months before the Convention, when did these intelligence briefings begin, either personally to you or to the Executive Committee?

A. I don't recall.

Q. Can you say that they began in 2004 or earlier than that?

MR. FARRELL: Objection.

A. They began almost immediately after it was determined that we were getting the Convention.

Q. How frequently did they occur?

A. I don't recall.

Q. Did they increase in frequency as the Convention approached?

A. Yes.

Q. What intelligence that you received suggested that people were coming to shut down venues relating to the Republican National Convention?

A. Just that, Intelligence Division would brief us as they were getting information.

Q. Again, do you remember any specifics

J. Esposito

at all with regard to what venues people were going to be trying to shut down, which people were going to shut them down, when they were going to try to shut them down and in what manner they were going to try to shut them down?

A. Blocking streets, blocking entrances, events that the delegates were going to go to, chaining themselves, sitting down.

Q. At what venues?

A. Just about every venue that the information was. They would go to the venues that the delegates were going to be at. It was more or less generic.

Q. Do you remember any specific intelligence about people going to shut down delegate-related venues on August 29th in the Times Square area?

A. What day of the week was that?

Q. It was a Sunday, the day of the large demonstration by United for Peace and Justice?

A. I am not sure.

Q. Do you remember any specific

J. Esposito

intelligence about people wanting to shut down or prevent or obstruct the ingress or egress of delegates into Broadway theaters?

A. Yes.

Q. Who gave you that information?

A. Someone from the Intelligence Division.

Q. Do you remember who?

A. No.

Q. Do you remember where?

A. No.

Q. Do you remember any specifics about what theaters or what was expected with regard to that?

A. Just the theaters that the delegates were to go to. I don't remember specifically which ones.

Q. What were the main hotels where the delegates were staying at?

A. I don't remember.

Q. Did you have any personal interaction with any of the delegates during the Republican National Convention?

A. Not that I recall.

J. Esposito

Q. What intelligence suggested that violent criminals were coming New York to engage in violent activity or to engage in civil disobedience?

A. Information that was given to me from the Intelligence Division.

Q. Again, do you remember any specifics at all about which violent criminals, about what violent acts were expected where and when they were expected to occur?

A. I can't recall the names.

Q. About how many individuals were individuals of concern in the run-up to the Republican National Convention?

A. I don't remember.

Q. There were some people who were designated as individuals of concern, correct?

MR. FARRELL: Objection.

A. Yes.

Q. About how many were designated as individuals of concern?

A. I don't recall at all.

Q. Were any lists or photo displays made depicting these individuals of concern?

Page 466

J. Esposito

Chief Colegan, would work alongside by him and be brought up to speed?

MR. FARRELL: Objection.

A. No. What I'm saying, you wouldn't relieve Devlin and bring Colegan in. If you are going to bring Colegan in, let him work with Devlin until Devlin leaves. I don't think we would have relieved Devlin if he was still working.

Q. Why would you have wanted Colegan to work with Devlin?

MR. FARRELL: Objection.

A. To get up to speed.

Q. Did you, at any time, have any conversations with Inspector Morris about RNC arrest planning prior to the RNC?

A. I forget when he came on board for the RNC.

Q. Do you remember why Morris in particular was chosen to work on this project?

A. Very well thought of. I believe he is an attorney. I just think we saw things in his background that we liked.

Q. Do you know if he ever worked with

Page 467

J. Esposito

the Legal Bureau?

A. I don't know.

Q. You said that RNC arrests would be reported to the Command Center. What Command Center were you referring to, sir?

A. Emergency Operations Center, the EOC, police headquarters. We have a big conference room. All of the agencies that were working with the RNC were represented there, and there is a sort of a central depository for all activity.

Q. Did you spend a fair amount of time within that Emergency Operations Center during the Republican National Convention?

A. No.

Q. Where did you spend the bulk of your time during the RNC period? Was it out on the street? Was it at a command office? What were you actually doing most of the time? How did you organize your days?

A. We get briefed in the morning on what happened the day before. We get daily briefings.

Q. By whom?

Page 468

J. Esposito

A. Intel would do a lot of it. Operations would do a lot of it. We would just get briefed on what happened day before.

Q. Who from intel would give those briefings?

A. Usually Cohen. We would have somebody there with him giving us the details of what happened the day before. McManus, Chief McManus who is the RNC coordinator, would be there naturally.

Q. And the Operations Division, are they within the Patrol Services Division?

A. They answer to the Chief of the Department.

Q. Are they Patrol Services?

A. No, Chief of the Department's office.

Q. What is their general duties?

A. They coordinate all of the citywide plans, activities details. They are the central depository for what is going on around the City.

Q. Sort of an overview of all of the different police operations?

A. Yes, sir.

Page 469

J. Esposito

Q. The coordination between the --

A. Bureaus, other City agencies, outside City agencies. Anything going on in the City would go through them.

Q. They would give you daily briefings as well as to what occurred on the prior day?

A. They would be part of a briefing process, yes.

Q. Would these briefings be given at the same time or --

A. Generally we try to get them down early in the morning, 8, 9 o'clock I believe they were.

Q. Was that in the Commissioner's conference room?

A. Most of the time they were in the Commissioner's conference room.

Q. How long would they take?

A. It varied.

Q. Were there any written documents that were generated as a result of that?

A. At times there may -- intel would have some documents at times. A lot of times it would be Operations. Operations may generate a

Page 711

J. Esposito

MR. FARRELL: Objection.

Q. What about the fact that you were arresting people involved in demonstrations made you adopt a no summons rule for people who presumably were arrested in non-demonstration related events at the same time elsewhere in the city were eligible for summons?

MR. FARRELL: Objection. Can you read that question back, please.

(The record was read.)

Q. What is it about the fact that somebody's being arrested at a demonstration led you to conclude that a no summons policy should be issued for an RNC related arrest when at the same time throughout the city people arrested for a non-RNC related event would be issued a summons if eligible?

MR. FARRELL: Objection.

A. If I heard it right, we gave out C-Summonses in other parts of the city for non-RNC related --

Q. Presumably, yes.

A. -- while at the same time at the RNC related event we had a no C-Summons policy?

Page 712

J. Esposito

Q. Right.

A. Just for all the reasons I articulated, all the information we were getting about the RNC.

Q. That information being what?

A. What I just said about the RNC --

MR. FARRELL: Objection. Asked and answered.

A. -- being -- well, it's a national security incident, a special security event, and that raised up our level of concern. The information we got about people coming into the city for the purpose of shutting the city down, for the purpose of shutting the RNC down, for the purpose of destroying property, attacking businesses, the possibility of a terrorist attack, the possibility of false identification, the probability of false identification.

Q. Now, all these factors that you mentioned, were they contained in some kind of intelligence briefing that you received?

A. Yes.

Q. Was this in written form or was it orally?

Page 713

J. Esposito

MR. FARRELL: Objection.

A. Both, I believe.

Q. From whom did you receive that -- you don't have to tell me specifically what it was -- but from whom did you receive that intelligence briefing?

A. The intelligence division.

Q. And that would be at the time and maybe still is, headed by Commissioner Cohen?

A. That's correct.

Q. And all those factors that you mentioned were factors that were identified in this briefing which you relied upon and adopted a no summons rule?

MR. FARRELL: Objection.

A. Yes.

Q. What changes in policing -- withdrawn. Did the fact that this event, the RNC, was designated a national special security event -- and you know what that is, right?

A. Yes.

Q. Did that fact mandate that you change your policing procedures in any way?

MR. FARRELL: Objection.

Page 714

J. Esposito

A. No.

Q. With the intelligence you had with respect to the intention of people to shut down the city and shut down the RNC -- I believe those were your words -- were there any specific credible allegations of that or was that just a general concern expressed by the intelligence division? I'm not asking what the specific concerns were, I'm just asking whether it was specific or whether it was just a general concern that that might happen?

MR. FARRELL: Objection.

A. I believe it was a concern based on intelligence they had gathered.

Q. Specific intelligence?

MR. FARRELL: Objection.

A. I believe so.

Q. Did you review that intelligence or was that a recommendation that was given to you, this is like George Bush, were there weapons of mass destruction -- no, that's off the record --

A. That was a potential.

Q. Was that information, did you review the specific intelligence of -- that indicated

Page 775

J. Esposito

be they be eligible for a summons?

MR. FARRELL: Can you read that back for me.

(The record was read.)

Q. Are you aware of any such policy in the police department prior to the RNC?

MR. FARRELL: Objection. If you understand it.

A. Online and a C-Summons only if the incident commander okayed it?

Q. Right.

A. Online referring to what?

Q. You tell me.

MR. FARRELL: Objection.

A. Well, what's your understanding of online?

Q. Well, let me ask you what your understanding of online is?

A. Online to me is usually above DAT, when you're being processed for a complaint before a judge.

Q. Are you aware of any such policy, given that definition of online, were you aware of such policy prior to the RNC?

Page 776

J. Esposito

MR. FARRELL: Objection.

A. I didn't think so.

Q. Assuming online includes both arraignment before a judge and the issuance of a DAT, are you aware of any policy that says for anybody arrested at a demonstration for a violation at a demonstration that they would be processed online unless an incident commander concluded that they should get a summons?

MR. FARRELL: Objection.

A. As I testified earlier, the incident commander has the discretion to give a C-Summons.

Q. So is it my understanding then that prior to the RNC that for people arrested at demonstrations that the presumption would be that they would be processed online, which could include being given a DAT or going before a judge for arraignment, and that the presumption would be that that's how they would be processed, and that only if the incident commander decided they should get a summons that they would be eligible for a consideration for a summons?

MR. FARRELL: Objection.

A. I'm not sure.

Page 777

J. Esposito

MR. MOORE: I have nothing further. Thank you, Chief Esposito.

MR. FARRELL: All right, it's 12:29. Do you need a break?

(A recess was taken.)

EXAMINATION BY
MS. WOHLFORTH:

Q. Good afternoon. My name is Karen Wohlforth. I represent Jody Concepcion, a plaintiff in this action. I just have a few questions for you today, and you'll excuse me if I may repeat certain information because I wasn't able to be at certain of your other depositions, but it will be short.

I understand that you testified that you met with Mr. Cohen, David Cohen, on a regular basis?

A. Yes.

Q. When did those meetings start prior to the convention?

A. Just about immediately when we were awarded the convention.

Q. And did those meetings step up in frequency as you came closer to the convention?

Page 778

J. Esposito

A. Yes.

Q. How often did you meet with him in the months prior to the convention?

A. I couldn't say.

Q. Once a week?

A. Yes, at least.

Q. And who else attended those meetings?

A. At times the commissioner would be there, at times it would just be me and Cohen.

Q. How was John McManus involved?

MR. FARRELL: Objection.

A. Jack was the coordinator for the RNC, he was the point person for the RNC.

Q. Can you tell me what his duties involved as the point person for the RNC?

MR. FARRELL: Objection.

A. Really organizing the whole event.

Q. Coordinating with this Committee on Arrangements?

A. Coordinating with other city agencies, federal agencies and the RNC people, City Hall.

Q. Did he attend any of the Intel

Page 791

J. Esposito

explosive device that was retrieved by anyone in the NYPD as a result of the convention?

MR. FARRELL: Objection.

A. I would have been aware. Would I remember every incident, no. When they arrested the fellows or the people responsible for setting something on fire on 34th Street, I'm not sure if there was any explosive or accelerant retrieved. Are you aware when they set the display on fire? I'm not sure, they may have recovered some flammable substance, I'm not sure though.

Q. But other than that particular incident that involved a fire, do you have any recollection of any explosive devices that were actually vouchered as a result of any arrests?

A. I don't recall any.

Q. Do you have any recollection of any guns or firearms of any sort that were actually vouchered as a result of any arrest?

MR. FARRELL: Objection.

A. Not that I recall.

Q. Nonetheless, as a result of your meetings with Intel, the information that you received led you to expect that you would find --

Page 792

J. Esposito

that you might find firearms or explosive devices during the course of this convention; is that not true?

MR. FARRELL: Objection.

A. We felt the potential was there.

Q. Was that potential as a result of any specific Intel that was given to you by the intelligence unit?

MR. FARRELL: Objection.

A. Yes.

Q. Was that intelligence that you received with respect to any particular location?

MR. FARRELL: Objection.

A. I don't recall location being mentioned.

Q. It was a general threat with respect to any area in the city or was there any specificity as to the information that you received from Intel?

MR. FARRELL: Objection.

A. As far as the location?

Q. As far as any location, I don't need to know the location, as far as any location or any specific detail regarding what was going to

Page 793

J. Esposito

be done that might have involved -- that was intended to involve guns or explosive devices?

MR. FARRELL: Objection.

A. Yes, we had information. Did I have information about specific --

Q. Specific information?

MR. FARRELL: Objection.

A. Definition of specific -- certain people, named people, that were coming here who had a history of that type of behavior using explosives, yes, we had specific information.

Q. But nothing was found?

MR. FARRELL: Objection.

A. No, not to my recollection. You asked me if there was specific information about people, places or things who would be involved with explosives or firearms?

Q. Correct.

A. Information we received from Intel were about individuals who had an arrest history of that type of behavior that were coming here during the RNC, yes.

Q. Did you have any information that any of those specific individuals were expected

Page 794

J. Esposito

to turn up on East 16th Street on August 31st?

A. We knew they were coming for the Republican National Convention. We didn't know exactly what location they were going to go to.

Q. Now, with respect to the issue of the warnings, were your command people provided with bullhorns for warnings?

A. I believe so.

Q. Were there specific instructions that each commander had to receive a certain number of bullhorns for any particular location that they were dispatched to?

A. No.

Q. Was there any assurance that there were bullhorns available for each commander for each location that they were dispatched to?

MR. FARRELL: Objection.

A. There should have been.

Q. Do you know whether they were?

MR. FARRELL: Objection.

A. I'm not sure if every particular commander had a bullhorn but one, I believe, was available.

Q. Where would it have been available?

J. Esposito

A. That varies. It should be in someone's vehicle, it could have been at the command post.

Q. Did you give any specific instructions with respect to any proposed demonstrations that were taking place at Union Square?

MR. FARRELL: Objection.

A. I don't think so.

Q. Are you aware of any specific instructions that were given to any of the commanders who were dispatched to Union Square on August 31st?

MR. FARRELL: Objection.

A. Specific instructions?

Q. Yes.

A. No.

Q. Did you have any meetings with Michael Tiffany at Intel?

A. I believe Mike was still in the position of commanding officer of Intel at the time. He left our agency at one point, I believe it was after the RNC. So, yes, I would have had meetings with him.

J. Esposito

Q. He went to Washington, didn't he?

A. Yes.

Q. Did Michael Tiffany participate in most of these meetings with Commissioner Cohen that you had?

MR. FARRELL: Objection.

A. Some.

Q. Did you ever prepare any assessment as to the discrepancy between the intelligence that you received and what you actually found during the course of these arrests during the RNC?

MR. FARRELL: Objection.

A. I don't know what you're referring to.

Q. Did you ever prepare any written reports or critical assessments, did you ever evaluate why the intelligence that you received didn't pan out in terms of the arrests that actually took place during that convention?

MR. FARRELL: Objection. He never said that.

A. What do you mean by pan out?

Q. You received intelligence regarding

J. Esposito

expected violence or explosive devices and things of that nature. Those explosive devices were not retrieved as a result of these arrests during this convention; is that correct?

MR. FARRELL: Objection.

A. Correct.

Q. Did you ever do any evaluation or assessment as to the reliability of the intelligence that you received?

A. The intelligence was fine.

Q. Well, it proved not to be correct; isn't that true?

MR. FARRELL: Objection.

A. Not at all.

Q. You didn't find any explosive devices; is that correct?

MR. FARRELL: Objection.

A. We didn't say explosive devices were coming. There was potential for it. The individuals who had a history of using explosive devices were said to be coming to New York during the RNC. I believe good policing prevented the violence from reaching that level.

Q. Were any of these individuals that

J. Esposito

you were warned about, to your knowledge, on East 16th Street or Union Square on August 31st specifically?

A. I don't know.

Q. Is there anyone who would have knowledge of that?

A. The intelligence division might have knowledge of that.

Q. But anyone in your policing force --

MR. FARRELL: Objection.

Q. -- who would actually be on the ground at the site?

A. Intel is on the ground.

Q. Are you aware of any reports from Intel on the ground, back to central command, that any of these individuals that you were looking for were actually at East 16th Street?

MR. FARRELL: Objection.

A. Some of the individuals of concern were on the streets during the RNC. I believe one was seen in the area of Union Square Park. I guess that's close proximity to 16th Street, would you consider that?

Q. On August 31st?

J. Esposito

A. I don't know what date. It may have been the 31st -- no, I'm sorry, I don't know, I'm not sure.

Q. Do you know if any of your undercovers were part of the sweep on East 16th Street?

MR. FARRELL: Objection.

Q. On August 31st?

MR. FARRELL: Objection. I assert the law enforcement privilege to any questions about the existence or nonexistence of undercover police officers, as I've done for the entire questioning of witnesses.

MS. WOHLFORTH: I have no further questions.

(A luncheon recess was taken, 1:15 P.M. - 2:55 P.M.)

AFTERNOON SESSION

EXAMINATION BY
MS. RITCHIE:

Q. Good afternoon. My name is Andrea

J. Esposito

Ritchie, I'm counsel for Plaintiff Caitlin Tikkun in Civil Action 059901. I have some questions for you primarily about NYPD policy and practice.

A. Okay.

Q. It's my understanding that you testified earlier in this deposition that sexual harassment by members of the New York City Police Department would not be tolerated; is that correct?

A. Correct.

Q. As chief of department, are you aware of any specific NYPD policy concerning sexual harassment?

MR. FARRELL: Objection to the extent it's been asked and answered previously.

A. We have a policy, and basically it's not going to be tolerated and we will investigate any allegations and take appropriate disciplinary action if necessary.

Q. Are you talking about sexual harassment between NYPD employees or does this policy cover interactions between NYPD officers and members of the public?

J. Esposito

A. Well, it really is the same policy for both, we are not going to allow it. Now, an investigation may be done by an outside agency, not us, depending on who the complaint is made to. Civilian Complaint Review Board may do it, the DA's office may do it, it depends on the allegation and how it's taken and the severity of it.

Q. So you're saying that if the complaint is made to the Civilian Complaint Review Board, they would conduct the investigation?

A. They get sent to that area. They refer it back to us because it's criminal, they may refer it to the DA's office.

Q. Might it also be investigated by the Internal Affairs Bureau?

A. Sure.

Q. Can you tell me where that policy is found, is it written down somewhere?

A. Regarding with prisoners or within the agency?

Q. Well, let's start with within the agency?

J. Esposito

A. Within the agency, the statements by the Office of Equal Employment, they're the ones who oversee this policy. And as far as with regards to prisoners, it would be in the patrol guide how to treat prisoners.

Q. Can you give me a precise reference to a section of the patrol guide?

A. No, I don't have it.

Q. Do you know if there is a section that deals specifically with sexual harassment?

MR. FARRELL: Objection.

A. I'm not sure if it mentions that per se.

Q. So what section are you thinking of?

A. With regards to how to treat prisoners.

Q. It's your understanding of the section that deals with how to treat prisoners specifically refers to sexual harassment?

MR. FARRELL: Objection.

A. I don't know if it does.

Q. What about members of the public who are not prisoners?

MR. FARRELL: Objection.

J. Esposito

A. No.

Q. Do you recall the issue coming up in connection with the 6th Precinct?

MR. FARRELL: Objection.

A. Not specifically, no, I don't.

Q. You referred earlier today on having received specific information from Intel concerning issues relating to identification documents?

A. Yes.

Q. And the concern was that people be carrying false identification documents; is that correct?

A. Yes.

Q. Did any of that information suggest that people would be carrying identification documents that reflected a gender that was different than -- that was of a different gender than you would expect?

MR. FARRELL: Objection.

A. I don't recall that being talked about.

MS. RITCHIE: I have nothing further. Thank you.

J. Esposito

MR. FARRELL: For the record, just as I have with the prior days' testimony and the continuing deposition of Chief Esposito, we would request to review and sign pursuant to Rule 30.

There are no other counsel here who are seeking to question Chief Esposito, so the deposition of Chief Esposito is closed.

(Time noted: 3:30 P.M.)

J. Esposito

I, the witness herein, having read the foregoing testimony, do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

________________________
JOSEPH ESPOSITO

Subscribed and sworn to before me this ____ day of ________________ 2006.

________________________
NOTARY PUBLIC

CERTIFICATE

STATE OF NEW YORK )
:ss
COUNTY OF NEW YORK )

I, MARION FROLA, a Court Reporter and Notary Public in and for the State of New York, do hereby certify:

THAT the witness whose testimony is hereinbefore set forth, was duly sworn before the commencement of testimony; and

THAT the within transcript is a true record of the testimony given by said witness, to the best of my ability.

I further certify that I am not related, either by blood or marriage, to any of the parties to this action; and

THAT I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of July 2006.

________________________
MARION FROLA

# EXHIBIT R



THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

MICHAEL A. CARDOZO
*Corporation Counsel*

JAMES MIRRO
*Special Assistant Corporation Counsel*
*phone (212) 788-8026 fax (212) 788-9776*

February 1, 2008

***BY FAX***

The Honorable Richard J. Sullivan
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

***Re:*** ***Consolidated RNC Cases***

Dear Judge Sullivan:

On January 23, 2008, Magistrate Judge Francis issued an opinion and order granting in part and denying in part the motions of plaintiffs in approximately 37 RNC actions to amend their complaints to add various claims and defendants (the "Order"). As Your Honor may recall, plaintiffs' motions to amend were filed nearly three years after the incidents giving rise to these claims, on the eve of expiry of the federal statute of limitations and after nearly three years of consolidated discovery in the RNC cases.

In the Order, the Magistrate Judge has permitted plaintiffs to add as a defendant Deputy Commissioner of Intelligence David Cohen although we believe that plaintiffs have not properly pled any cause of action against him. Due to the importance of this issue, and other potential grounds for appeal that we are reviewing, defendants will appeal the Order for Your Honor's review.

In light of the burdens under which defendants are laboring in these numerous actions, which includes ongoing party and nonparty discovery as well as heavy briefing schedules before both Your Honor and Magistrate Francis on various issues, the parties have conferred on a briefing schedule. Plaintiffs' counsel, Jeffrey Rothman, has consented to the schedule proposed below; in several conversations, the Beldock firm, through Ms. Norins, has expressed no objection but has not yet provided a final answer; Ms. Weber consents on the

condition that she be permitted an extra week to submit her opposition to the appeal; other plaintiffs' counsel who have moved to amend have not responded to our email inquiries.

Based on these discussions, the parties propose the following schedule: defendants appeal shall be due on February 25, 2008; plaintiffs' opposition shall be due on March 17, 2008; and defendants' reply shall be due on March 31, 2008. The parties respectfully request that the Court "so order" it.

Respectfully submitted,

James Mirro

cc: RNC Distribution List (by email)

# EXHIBIT S

**Clare Norins**

---

**From:** Clare Norins
**Sent:** Sunday, February 03, 2008 3:42 PM
**To:** Sundaran, Raju; 'Mirro, James'; 'Farrell, Peter'
**Cc:** Jonathan C. Moore; Rachel Kleinman
**Subject:** Briefing on Rule 72 re Amending Complaints

Hi Jim & Raju:

Counsel in MacNamara consents to the proposed briefing schedule with the understanding that defendants will not be appealing the addition of the as-applied constitutional challenges to the Parading Without a Permit and Disorderly Conduct statutes.

Thanks,
Clare

Clare Rivka Norins, Esq.
Beldock Levine & Hoffman LLP
99 Park Avenue, Suite 1600
New York, New York 10016
(212) 490-0400 (phone) (212) 277-5882 (direct)
(212) 557-0565 (fax)

**CONFIDENTIALITY NOTICE:** The information in this e-mail is attorney privileged and contains confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message and its accompanying documents is strictly prohibited. Please delete the message and notify the sender of the receipt of the message by reply. Thank you.

**Circular 230 Disclosure:** To ensure compliance with recently-enacted U.S. Treasury Department Regulations, we are now required to advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication, including any attachments, is not intended or written by us to be used, and cannot be used, by anyone for the purpose of avoiding federal tax penalties that may be imposed by the federal government or for promoting, marketing or recommending to another party any tax-related matters addressed herein.